## GENERAL SHOE CORPORATION v. HALL.

No. 5298.

Court of Civil Appeals of Texas. Texarkana.

Nov. 10, 1938.

Rehearing Denied Nov. 24, 1938.

Stinchcomb, Kenley & Sharp, of Longview, for appellant.

Hatchell & Hatchell, of Longview, for appellee.

WILLIAMS, Justice.

This is a suit by appellee, Henry W. Hall, for damages resulting from the alleged breach of contract by appellant, General Shoe Corporation. Briefly stated, plaintiff pleaded that an oral agreement

was made between him and defendant acting through salesmen, Freeman and Doherty, on the respective dates of May 15th and June 1st, 1935; that under and by virtue of this agreement he was employed by defendant as exclusive agent, or granted the exclusive right to sell defendant's lines of "Fortune" and "Friendly" shoes in Longview; that in order to secure such exclusive agency, defendant required plaintiff to dispose of a competitive brand, the "Booth" shoe, and to discontinue this line then being featured by plaintiff; that at the time these agreements were made, plaintiff ordered 189 pairs of "Fortune" and 450 pairs of "Friendly" shoes for early fall delivery; that plaintiff proceeded to dispose of his Booth shoes by putting on a special "close-out" sale at reduced prices, advertising at the time that he would discontinue this line and handle the new line of shoes; that he did not place any orders for Booth shoes for his fall business; that thereafter, on July 11, 1935, defendant notified plaintiff that the shoes would not be shipped and that the Company would not in the future sell him shoes, advising that it had decided to continue the sole agency at Longview with Davis & Martizky. Plaintiff alleged that after the alleged breach it was then too late to secure and properly advertise for fall business any other nationally advertised shoe in this price class; that he lost the agency of the Booth shoes as it had been placed with another firm; and that the wholesale price of shoes had advanced 15 cents per pair by the time he could purchase other shoes in this class. Plaintiff further alleged that he sold over 500 pairs of the Booth shoes in the close-out sale at an average loss of $1 per pair; that if defendant had complied with the alleged agreement he would have sold through the fall of 1935 four hundred pairs of "Fortune" shoes at a net profit of $250, and 1000 pairs of "Friendly" shoes at a net profit of $1,000; that the rise in the wholesale price amounted to $175; and prayed judgment in the sum of $1925 actual damages.

The jury found plaintiff to have been damaged by reason of the sale conducted on the Booth shoes in the sum of $998; that plaintiff had sold 998 pairs of men's dress shoes between July 1, 1935, and January 1, 1936, and would have sold 1,728 pairs of "Friendly" and "Fortune" shoes during this same period of time had such shoes been shipped as ordered; that plaintiff would have made a profit of $1.75 on each "Friendly" and $1.35 on each "Fortune" pair of shoes; and that plaintiff had been damaged by reason of advance in wholesale price in the sum of $109.50. Judgment was entered for $859.50.

We will pretermit a discussion of appellant's propositions which attack the judgment so entered upon the foregoing findings on the items of damages.

We proceed directly to appellant's 4th proposition, reading: "A purported contract between wholesaler and retailer whereby the retailer was given the agency for a particular territory, but which contract obligated the said retailer to purchase no shoes nor any amount of shoes over any definite period of time at any definite price, was void for want of mutuality, a unilateral contract, and subject to termination at any time, by either party."

All the testimony relating to the agreement that was made, and especially as to an exclusive agency contract having been made, was given by plaintiff, Hall who testified as follows:

"Mr. Freeman came into my store and we talked about me buying 'Fortune' shoes and he told me he had been selling Davis & Martizky a good many shoes in his old building, in the Glover building, but since they moved in the other block wasn't doing any good with the shoes, and he wanted me to take the shoes and if I was open for the account, and I told him I always wanted the shoes and would be very glad to get them. We talked further and he said further he didn't believe Davis & Martizky were particular about the 'Fortune' shoe and he would be glad to give me the agency for the 'Fortune' shoes in Longview, and I told him 'I would be glad to get them because it was a $4.00 shoe and an advertised shoe. He got out his samples and I got the shoes, ordered the shoes.

"As I said he said Martizky probably didn't care much about the 'Fortune' shoes because he was in a higher price block and I could have the exclusive agency right off at the time without any further sale to anybody and it wouldn't hurt Martizky any way because he probably didn't want the $4.00 shoe to begin with.

"Mr. Freeman and I discussed how I was going to be able to buy these shoes, in that I had a large stock, which we always did carry and do now, and I told

him I would be glad to sell the shoes on a sale and he said, 'Well, it ought to be done, because if you are going to push our line you should get rid of the old shoes so you can put ours in and sell them.'"

In regard to the deal made on the "Friendly" shoes plaintiff testified: "Mr. Doherty came in the store about 4:30 in the afternoon. I remember the time of day in that instance and we talked about an hour and a half and I didn't look at the shoes at that time, because he wanted me to see them in the sample room at the Magnolia Hotel. He also talked about Davis & Martizky not doing so well since they moved and they should sell more shoes in Longview, and since I wanted it he would be glad to give me the agency. I told Mr. Doherty this, and he agreed to it; that Mr. Martizky should have time to get a new line of shoes so it wouldn't inconvenience him any more than possible. Mr. Doherty and I agreed Mr. Martizky should have two or three months to get a line, and then I should have the exclusive agency for the 'Friendly' shoes. It was my own suggestion that the thing be held up a month, or two months, but to be worked out by the first of the year, so Mr. Martizky would have time to get him a line of shoes and at the same time I was to have the exclusive agency of the 'Friendly 5' shoe, not later than January one (1)."

He testified that Mr. Doherty also required him to get rid or dispose of his old stock as Mr. Freeman had previously required. Plaintiff further testified as to the loss of his agency to sell the Booth shoes, and of his efforts to secure another line of shoes in the same price class.

Plaintiff placed an order with defendant's salesmen for 450 pairs of "Friendly" shoes to be delivered through the month of September. This order also contained the memorandum "early shipment permitted." Plaintiff also ordered 189 pairs of "Fortune" shoes to be delivered in the early fall.

■ It, is apparent from the issues submitted to the jury on the items of damages that a period of time between July 1st and January 1, 1936, was used as a basis to calculate the amount of damages. Plaintiff did not plead, nor does the evidence offered by him show that plaintiff agreed to buy any particular number of shoes of either brand outside of the original orders placed at the time; or that these parties agreed on the prices of any other shoes to be ordered or shipped in the future; or that the exclusive agency was to exist for any particular period of time. Plaintiff did not plead or prove that under the contract reached there was an implied agreement and so contemplated between these parties plaintiff was to buy from defendant all the shoes he would need in this price line in his business at the prevailing prices, and defendant would sell and ship him the same. If the pleadings and evidence had supported such an implied agreement the same would not be sufficient to support a valid cause of action based upon an exclusive agency, unless the evidence further disclosed a definite period of time for such an agreement to exist or continue, or presented facts capable of showing a definite period of time. On this question of mutuality the rule is thus stated in Elliott on Contracts, Vol. 1, Sec. 231: "A promise may constitute the consideration for another promise * * * but a promise is not a good consideration for a promise unless there is absolute mutuality of the engagement, so that each party has the right to hold the other to a positive agreement. * * * In case the promise of one of the parties imposes no legal duty upon the party making it, such promise furnishes no consideration for a promise. Therefore, * * * where a contract of employment fails to bind one of the parties for either a definite or indefinite time but by its terms bind the other, or in other words, where the continuation or termination of the contract rests with the will or actions of one of the parties, such a contract is not considered a mutual obligation and therefore not binding upon either unless the element of mutuality is otherwise supplied."

In support of the foregoing rule of law, and in support of the conclusion reached that the pleadings and evidence as presented will not support a judgment for damages for breach of the alleged exclusive agency contract for the period of time between July 1st and January 1st, see Grand Prairie Gravel Co. v. Joe B. Wills Co., Tex.Civ.App., 188 S.W. 680, writ ref. and authorities there reviewed; International Shoe Co. v. Herndon, 135 S.C. 138, 133 S.E. 202, 45 A.L.R. 1192, and decisions there discussed; Gordon v. Emerson Shoe Co., Tex.Civ.App., 242 S.W. 791; Du Pont v. Claiborne-Reno Co.,

724

8 Cir., 64 F.2d 224, 89 A.L.R. 238. United Appliance Corp. v. Boyd, Tex.Civ.App., 108 S.W.2d 760, supports the conclusion here expressed.

Plaintiff's cause of action for damages under the pleadings and evidence as now presented on this appeal would be limited to such actual and special damages as would flow from a failure to deliver the shoes ordered in May and June. 37 Tex.Jur. Sales, Secs. 143, 305, 309, 310; 13 Tex.Jur. p. 86, Sec. 17. If special damages for breach of contract is sought, the same would be such as were the direct and proximate result of the alleged breach and which could have been reasonably foreseen and anticipated by the defendant. If profits be an element of damages, it would be net profits. The testimony in this record relative to whether these salesmen were acting within the scope of their employment, or whether their acts were ratified by the defendant, were issues of fact for the jury.

For the error above pointed out, the judgment is reversed and the cause remanded.