### GORDON v. EMERSON SHOE CO. et al. (No. 835.)

(Court of Civil Appeals of Texas. Beaumont. June 7, 1922.)

1. Contracts ⬡10(4)—Contract for future delivery of personalty void if quantity to be delivered conditioned on will of other party.

A contract for the future delivery of personal property is void for want of consideration and mutuality, if the quantity to be delivered is conditioned by the will, wish, or want of the other party; but it may be sustained if the quantity is ascertainable otherwise with reasonable certainty.

2. Sales ⬡1(4) — Contract to purchase "$4,000 worth of shoes," styles, sizes, etc., to be selected later not binding.

Where a contract to purchase "$4,000 worth of shoes," provided that the styles, sizes and prices were to be selected later, the subject-matter being too indefinite to be capable of identification, the contract was incomplete, uncertain, and not a binding obligation.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Action by Abe Gordon against the Emerson Shoe Company and others. From judgment for defendant named on its cross-action, plaintiff appeals. Affirmed.

Fouts & Patterson, of Houston, for appellant.

Dannenbaum, Amerman & Sears and Otto Taub, all of Houston, for appellee.

O'QUINN, J. Appellant, as plaintiff below, sued the Emerson Shoe Company and R. M. Richart for damages for breach of an alleged contract to sell plaintiff shoes.

The following is taken, in substance, from appellant's statement of the nature and result of the suit. This suit was brought by appellant against the Emerson Shoe Company and R. M. Richart, to recover the sum of $10,000 damages for breach of contract by appellees to furnish appellant $4,000 worth of shoes. In his petition appellant admitted an indebtedness to the appellee Emerson Shoe Company of $4,425.80, which he pleaded and asked that same be applied and set off against any recovery which he might obtain against said company. Appellant alleged, in substance: That, in August, 1919, R. M. Richart, who was the agent and representative of the Emerson Shoe Company, informed appellant that he (Richart) would in a short time go to the factory of said Emerson Shoe Company, and requested appellant to place his order for goods to be made and delivered for the spring trade of 1920. The said Richart, as the agent and representative of said Emerson Shoe Company, agreed and obligated himself and his said principal, the said Emerson Shoe Company, to deliver shoes to appellant for the spring trade, 1920, and to protect appellant for the order given in the sum of $4,000, and appellant agreed that he would purchase of said Richart and said Emerson Shoe Company, $4,000 worth of shoes for the spring delivery, 1920, the styles and sizes to be selected upon the return of said Richart from said factory, this being the customary method of giving and taking orders for shoes theretofore existing between appellant and said appellees, which said order for $4,000 worth of shoes was so taken and accepted by appellee. That, relying upon said Richart and Emerson Shoe Company to fulfill their said contract with appellant to deliver shoes to him as per said contract, appellant did not place other orders for shoes for said spring trade, 1920, and that thereafter said appellees entered into a contract giving the exclusive right to sell Emerson shoes in the Houston territory to another party, and refused to comply with their said contract to deliver to appellant $4,000 worth of shoes for spring delivery, 1920. Appellant also alleged various items of damage, which, in view of the court's

instructing a verdict against appellant, need not be stated.

The defendant Emerson Shoe Company answered by general demurrer, general denial, and cross-action against plaintiff for debt in the sum of $4,425.80. The defendant J. M. Richart answered by general demurrer and general denial.

The case was tried before a jury, who, after the evidence was concluded, under peremptory instruction of the court, returned a verdict in favor of defendants, upon which judgment was rendered against plaintiff and in favor of defendant Emerson Shoe Company for its debt, from which judgment plaintiff has appealed.

Appellant presents two assigments of error, each attacking the action of the court in peremptorily instructing a verdict for defendants. We quote so much of the testimony as we deem necessary for an understanding of the alleged contract: Abe Gordon, plaintiff, testified:

"I am engaged in the shoe business here in the city of Houston, Tex. I have been engaged in the shoe business in this city since 1915. * * * My shoe business is the retail shoe business. * * * In operating such a business as I operate it is necessary to feature some particular line of shoes, what we call a 'top liner.' * * * I had used the Emerson shoes as a top line ever since I began the business and I began in 1915, so that I began business with the Emerson shoe as a top liner. * * * I dealt with the Emerson Shoe Company through Mr. Richart. He is the gentleman who always sold me the Emerson shoe. * * * In the usual course of business those dealings would be consummated in this way: Mr. Richart came around, for instance you see, and those shoes are bought three or four months ahead because they have to make them up for the customers as the customers select them. * * * When the orders were given he would come around and say, for instance: 'I am going to the factory; if you want to place the order, go ahead, please, then I will bring down my orders; when you pick out your shoes or what styles you want and then we will ship you your goods,' a certain day whenever I say I want them. For instance, I buy the stuff in August; and if I want it to come out in October or November, at that time they ship it. * * * So Mr. Richart he came and said: 'Now, you know we have the same price on shoes as we had about three months ago, but I am looking for a rise.' * * * I think it must have been in August or some time during that month, or July possibly. We were giving the order in for 1920, for the spring, you know, and Mr. Richart came by, as he usually came by. Of course, we never had no contracts made or anything like that. So Mr. Richart says, 'Now, I am going to the factory.' He said that to me in the store, and he says: 'Shoes are going up. You had better place your order right now, so I will protect you. When I get there I will have your order and protect you in the case of a rise and you won't have to pay it.' * * * And I told Mr.

Richart, 'All right, I think I will take the opportunity and give you my order,' and I did. I told him to protect me for about $4,000 and he said, 'All right, you are on. I am going to the factory to-night. When I get back we will take sizes,' and 'I got your order,' and that is all, and he went away. I don't recall exactly when I next saw Mr. Richart, but I think it was in about a week or 10 days, something like that; but just as soon as he came back, and he came right by the store and he said, 'Hello, I just arrived and you are protected.' I said, 'I am protected?' and he said, 'Yes, you are.' * * * He said, 'It is all right. In a day or two we will take sizes.' * * * I think it was a day later or something like that when he came by again, and he says, 'Well, we will take sizes.' I believe that was Thursday night, we had agreed to take sizes Thursday night. It was about Tuesday he came back, then Wednesday he came by again and he said, 'Thursday night, if it is satisfactory to you we will take sizes, something of that kind.' 'Well,' I said, 'All right, it suits me very well and we will take sizes Thursday night.'

In the meantime a gentleman came down from St. Louis and he always comes and sees me when he comes here, representing a shoe house in St. Louis, a very good shoe they are selling, not quite as good as the Emerson, but a very good selling shoe. They can be used for a top liner; and he came into the store in the morning, I believe it was, Thursday morning he came into the store, and he says, 'Hello'—the name of the man from St. Louis, who came in to see me was Mr. Smith, and he was connected with the United Shoe Company. The United Shoe Company did handle a line of shoes that was suitable for being a top line shoe. Well, Mr. Smith came in, that morning and he has known me very well, but I never bought anything much from him, except maybe a dozen or two dozen shoes when I was short. So Mr. Smith said to me, these was the words, he said, 'Would you take my shoes for spring delivery?' and I said, 'No; you know I am not handling your shoes.' Well, he said, 'You will have to buy it.' I said, 'Why will I have to buy it?' 'Well,' he said, 'you won't be able to get the Emerson shoes any more.' Mr. Smith did know that I was handling the Emerson shoes, so he said, this is the words he told me, 'You won't be able to get the Emerson shoe any more.' So I said, 'Why I don't understand.' 'Well,' he said, 'because they sold out to one man in this town and they have made a contract with that man that they wouldn't sell anybody else but this man; and, I says, 'I believe you are mistaken. I got my order in. Mr. Richart just saw me this morning and he said that I am protected.' * * * So I said, 'You must be mistaken or you are joking.' 'No, sir,' he said, 'I am not. You better come up and place your order with me so you will be safe.' So I said, 'No, I will ring up Mr. Richart,' and I went to the phone and called to Mr. Richart and told him in detail the conversation that had passed between me and this man Smith, and Richart told me. * * * He said Mr. Smith didn't know what he was talking about. He said, 'He is just wanting to get the order is all.' I did tell Mr. Richart

that Smith had advised me the Emerson Shoe Company had made an exclusive contract to sell their shoes here in Houston. I certainly did tell him that, and I wouldn't be able to get the Emerson shoe any more, and he says, 'It is nothing of the kind. You are protected. I sold to you and you will get the shoes, and you needn't bother at all.' And I said, 'This aint no plaything and I want to know positively.' The reason I wanted to know positively at that time is because I know if they didn't ship them to me and I didn't place my order right now that I won't be able to have my shoes for spring, and that will injure all my business, and it was the last few days that a fellow could place orders for attention, because if you don't do it now you can't get it. Of course, you can go into market and buy broken lots. That was the last opportunity I had for placing my order for spring stuff. * * * I did tell Mr. Richart that if I couldn't get the Emerson shoes I would buy from Smith. Mr. Richart said to that 'It is nothing of the kind; no use for you buying from anybody else because our stuff is always shipped you and this is going to come now, and we are going to take sizes to-night,' and that I would be protected under the order I had given him. But we did not take sizes that night. The next day was Friday. Well, Mr. Richart came by again, which I think was Thursday evening and he says he is going away for a day, somewhere, and he says, 'I will be back and we will take sizes to-morrow night.'

That was supposed to be Friday night that we would take sizes. I said, 'All right, it suits me.' Of course, if he had to go away that didn't make much difference. Friday morning I heard again that Emerson Shoe Company sold to some gentleman here in town in the line, and I won't be able to get it. I next saw Mr. Richart Friday evening about 5 o'clock, 4 or 5 o'clock, and the very moment I saw him I did not have a chance to tell him anything because he told me. He came right through the store, Mr. Richart did, and I was upstairs in the office, and he says, 'Mr. Gordon, this is the dirtiest trick that the Emerson Shoe Company has every played on me and you.' I said, 'What is the matter?' He said, 'Why I have got a telegram just now in my hand telling me not to send anything because they have sold out to Meyer-Nachlas and nobody can get their shoes any more,' and he says, 'To show you I think it is a dirty trick, I quit them cold, and I am going to sell shoes for some other company.' He said, 'They are nothing but dirty people,' and I said, 'I think like that.' So then I said, 'I should think they are. What do you think they mean by that? Why they are injuring me.' He said, 'I know that too, but what can we do?' I had a check made out to send them, and I said, 'I know what I will do. I will offset my account against them and sue them for damages; I have not seen my lawyer yet but I think I will do it. I think they have injured me and I will advise with my attorney.' I never did take sizes with Richart on the order I had given him. Neither were those shoes ever delivered to me on the order I had given them. * * * I did state that the shoes increased in price from

the time I gave Mr. Richart my order until the time I was told I couldn't get the shoes. I think my orders were in for about $6 a pair, something of that kind, I do not exactly recollect; I don't remember exactly to the cent, but I do know shoes went up from two to three dollars a pair. We wrote the Emerson shoe factory and asked them about it, but they didn't answer. * * * After Mr. Richart told me he couldn't fill my order I tried two or three different people in an effort to place an order for another set of top line shoes or a somewhat similar character as the Emerson shoe was. I did buy some top grade shoes of a somewhat similar character, buying from Helmers, Bettman & Co. of Cincinnati. * * * The prices of these shoes I bought had increased from the time I gave my original order until the time I bought them, they had increased about $2 a pair, I think. * * *"

Cross-examination:

"When Mr. Richart refused to go on and take sizes with me, he told me that the contract had been made so that he couldn't deliver shoes to me. I do not know, cannot recollect that that conversation took place some time in July; I believe, if I am not mistaken, that it took place some time in August. It took place soon after his return from Boston or wherever he went, his return from the factory. He did not tell it to me just as soon as he got back from the factory. It was several days afterwards during the week of his return. * * * I was not, about the time Mr. Richart had this conversation with me about which I have testified, contemplating opening up a store in Galveston. About a year before that I was thinking of opening a shoe store in Galveston. * * * There is a letter from Mr. Richart to me which speaks for itself with reference to Mr. Richart offering to sell those shoes to me through Galveston. It is a fact that Mr. Richart did, however. He didn't tell me that, but he wrote me that he would ship the shoes through Galveston after he refused to deliver them in Houston. I did not make any answer to that letter from Mr. Richart. I did refuse to accept the offer to ship them to me through Galveston. I didn't want my stuff to come to Galveston, I wanted it to come to Houston. The shoes that were shipped to me from Rockland were billed to Houston. The way he offered they were to be billed to Galveston, and I didn't want them billed that way. I didn't think it was right. That ended the negotiations with reference to this particular order for shoes, and Mr. Richart and I had no further dealings with reference to the purchase or sales of shoes by him to me. I never saw him any more I don't think. * * * As soon as Mr. Richart told me that they wouldn't ship our order—a few days later I think it was—I wrote the Emerson people a letter, expecting them to ship the order anyhow, and I think I have a copy of that letter. I think that letter was written some time in September. As to it being true that they wrote me on October 15th and threatened to sue me if I didn't pay—November 15th rather, and that on November 17th I wrote them telling them for the first time about this

breach of the contract; why, I think I wrote them before that."

R. M. Richart testified:

"* * * I have been with the Emerson Shoe Company about 6½ years now. * * * I did have a conversation with Mr. Gordon some time in the fall of 1919 with reference to his placing an order for Emerson shoes; that conversation occurred on August 25, 1919. The way I fix that date is I had a telegram from the factory telling me to come to the factory and telling me to be there August 30th, to the salesmen's meeting. I really didn't see Mr. Gordon in person, but I saw Mr. Porter. When I received this telegram I went in and saw Mr. Porter and said, 'Mr. Porter, I am going to the factory and I want to know how many shoes you want, because you know we have a limited number of pairs we can sell, and we have to spread them among our trade,' and Mr. Porter says, 'Well, Mr. Gordon is not in now, but I will see him when he comes in and let you know to-morrow morning,' so the next morning I went into the store and neither Mr. Gordon nor Mr. Porter were in, but Mrs. Gordon was there, and she says, 'Make it $3,500 he said, but I say, $4,000.' That is what Mrs. Gordon told me. I then went on to the factory, we go to the factory to what is known as the school of salesmanship to get lines on pairs, styles, patterns, and they tell us how many shoes. * * * I would then get information as to how many pairs of shoes I could sell. I got that information at the salesman's meeting. I was allotted 20,000 pairs of shoes for that season. After getting that allotment I had to figure out the number of pairs I could sell to each man and let them have, so that I could distribute them among my different trade in Texas. At that time I had about 115 accounts in the state of Texas. After I came back from the factory I went in to see Mr. Gordon and told him I was ready to take sizes, and at first he put me off. I went back again, and he put me off again. Then I went back the third time, and Mr. Porter told me they had decided they didn't want to take those shoes.

"There has been introduced in evidence here a letter from me in which I stated, in effect, that I was willing to sell him (Mr. Gordon) his shoes for his Galveston store. What I meant by that and how come me to write such a letter is Mr. Gordon was going to put in a store in Galveston, so he told me, and I told him I could sell him shoes for Galveston." * * *

"The contract which has been introduced in evidence here between Meyer and Nachlas and myself did not prevent me from taking Mr. Gordon's order for shoes. If any orders had been given I could still go on and fill them absolutely. I have never refused to fill an order and take sizes. Mr. Porter told me they didn't want to buy the shoes. I didn't that I know of, get any response or any answer to that letter of mine which has been introduced in evidence here, in which I offered to sell Mr. Gordon shoes for his Galveston store. I did testify about that conversation in which I was asked to book Mr. Gordon for $4,000 worth of shoes, but I never did write that order up.

It was never submitted to the Emerson Shoe Company. It was never submitted to any of the officers of that company for approval or disapproval. It couldn't have been submitted because it wasn't an order, and I didn't have any description, size, or anything else. I never did show the Emerson Shoe Company or any of its officers anything with reference to a $4,000 order for shoes for Mr. Gordon. That was just for my benefit. I mean by that we distributed that number of pairs. In other words, to make it plain, I could distribute the number of pairs that the factory allotted me. I did not. however, have any sizes or styles or prices prior to the time I went to the factory in September, 1919. on the Emerson shoes for spring delivery."

Cross-examination:

"I am still with the Emerson Shoe Company. My testimony is that the reason Mr. Gordon didn't get his shoes is because Mr. Porter who was the manager and buyer for Mr. Gordon, told me they didn't want to buy them —that. $4,000 matter. I did not say that I didn't go to see Mr. Gordon, because I did go there to see him two or three different times. I did see Mr. Gordon after I came back from the factory. I did not go to Mr. Gordon and tell him that the company wouldn't fill his order because they had made a contract with Meyer-Nachlas; I didn't tell him that at all. * * * I don't mean to tell the jury that Mr. Gordon had a store in Galveston at that time, but that he told me he was going to open one there. He had not placed an order with me for Galveston. I couldn't say that the first time the Galveston order came up is when there was a discussion about the $4,000 order being filled. I don't remember that. Really, I don't. * * * I did not, to my recollection, ever decline to fill that order for Mr. Gordon. I thought it was a blanket order. If Mr. Gordon had given me those sizes, perhaps I would have sent the order in, but I considered the negotiations closed when Porter told me they didn't want the shoes. Mr. Gordon never did personally give me an order, but Mrs. Gordon told me to book her for $4,000 worth of stock. * * * My purpose in going to Rockland, as I have stated, is that we have a school there where we get prices, samples, descriptions, and everything. So I told Mr. Gordon, 'Now. listen, I am going to the home office. Let me book you for some shoes before I go, because conditions are unsettled, and I don't know how my orders will be fixed up, unless you give them to me now.' I say that is about the substance of it. Then I got the order for $4,000 worth and wrote it down like I did 10 or 15 others. I did say to him that I was going to the home office where they make the shoes, and that I would have to have some idea what he wanted.

"Then when I got my allotment and came back to Houston I figured out about how much I could let each customer have. I will tell the jury that when I went to the factory I did not tell the Emerson Shoe Company, 'I want so many shoes for Mr. So and So, and so many for Mr. So and So'; neither did they ask me that question. I never once talked with them who had orders for shoes down

here. As stated, when I came back to Houston, I figured out the allotment. Well, I think I went in to see Mr. Gordon the very afternoon I came back, or perhaps the next morning, and I said, 'We will take sizes.' I think it was the following Thursday night I had an appointment with him. * * * My testimony is that Gordon would have gotten the shoes except for the fact that he said he didn't want them, or rather Porter did. I am pretty positive of that. Mr. Porter refused the shoes, and I considered the incident closed. Mr. Porter was the manager and buyer for the Gordon stores. Gordon did not personally do the buying from me. Porter always gave the sizes. Gordon would come to the sample rooms and he and Mr. Porter pick out the styles and Porter gave me the sizes."

Abe Gordon, recalled, testified:

"Mr. Porter is not now connected with me. Mr. Richart did come to me and tell me that he would be unable to fill the order embraced in the $4,000 blanket order that I had theretofore given him. On the Friday morning I had a talk with Mr. Richart and I remember it just like it is now of telling him that I had heard from the salesman, as I have stated before, and he told me, 'It aint anything of the kind. I will be there and we will take sizes,' and I said, 'Don't disappoint me,' and he said, 'I certainly will be there.' And when we got through we waited for Mr. Richart that evening and at 5 o'clock he ran to my office and I was sitting there making out checks to be sent out and he said, 'Mr. Gordon, what do you think of these people?' He just called me and showed me where they have secured a contract with Meyer-Nachlas and he said, 'Your order can't come.' I said, 'I have just talked to you this morning, Richart.' Well, he says, 'It looks to me mighty funny that you don't know anything; you know I am depending on you,' and he said, 'They are awfully dirty. I will quit them cold and sell you from the other house.' I did not have any store in Galveston at that time. Neither had I told him that I had a store in Galveston. I couldn't very well have told him because I didn't have one. Neither had I given Richart an order for any store in Galveston. I gave Richart personally the order for $4,000 worth of shoes. My wife happened to be in the store and I was going to dinner and in the meantime Richart came right in and I told them exactly what to do. I was in a hurry."

The only question for determination is: Was there any enforceable contract between appellant and appellee, Emerson Shoe Company? If so, then the court erred in instructing a verdict for defendants. If not, then the judgment should be affirmed.

[1, 2] We believe that the court's action was correct, and therefore that the judgment should be affirmed. A contract for the future delivery of personal property is void for want of consideration and mutuality, if the quantity to be delivered is conditioned by the will, wish, or want of the other party; but it may be sustained if the quantity is ascertainable otherwise with reasonable certainty. Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696. It is undisputed that neither the number of pairs, sizes, styles, or prices, nor the quality of the material of any of the shoes was specified in the alleged order. These were to be selected by the appellant at some later date. In the language of counsel for appellee:

"What identification of the subject-matter is there in the instant case? Can this court say how many shoes the contract contemplated, what kind of shoes? Were they to be an assortment of each, or all of one kind? Is there a line of pleading or of proof that would enable a jury to find whether, at the time of this transaction, either of these men had any idea whether '$4,000 worth of shoes' meant 2,000 pairs of low quarter brogues at $2 per pair, or 1,000 pairs of high top bluchers at $4 per pair?"

The subject-matter of the contract is too indefinite to be capable of identification. Where this is the case there is no meeting of the minds of the parties, and hence no contract. Price v. Atkinson, 117 Mo. App. 52, 94 S. W. 816. The agreement or contract being that plaintiff would purchase "$4,000 worth of shoes," the styles, sizes, and quality to be selected by him later, rendered the agreement incomplete, uncertain, and insufficient to constitute a binding contract or obligation. Bean v. Holmes (Tex. Civ. App.) 236 S. W. 121: Hume v. Bogle (Tex. Civ. App.) 204 S. W. 673.

From the evidence, the jury could not have found what appellant would have ordered if he had exercised his option to select sizes, styles, quality, etc. He did not testify how many pairs of shoes he intended to order, or whether he intended to buy all of one style at one price, or different styles and sizes and price and quality, or an assortment of styles and prices. Nothing appears in the record to show what his said order of $4,000 worth of shoes" would be. Suppose we turn the case around and that the Emerson Shoe Company was the complaining party, seeking damages of Gordon for not making a selection of sizes, styles, etc., and ordering the "$4,000 worth of shoes." What would be the measure of damages? No number of pairs of shoes, no sizes, no styles, nor any stipulated quality of shoes is found in the contract. There would not be any basis upon which to ascertain the measure of damages. The loss cannot be calculated from the contract or the evidence, because there is nothing upon which to base it.

"When no breach of a contract could be assigned which would be compensated by any criterion of damages to be furnished by the contract itself, the contract is void for uncertainty." El Paso Gas, Electric Light & Power Co. v. City of El Paso, 22 Tex. Civ. App.

309, 54 S. W. 800; Price v. Stipek, 39 Mont. 426, 104 Pac. 196; Price v. Atkinson, 117 Mo. App. 52, 94 S. W. 817; Wheaton v. Cadillac Co., 143 Mich. 27, 106 N. W. 400.

· But appellant insists that, if the contract was indefinite by reason of not stipulating the number of pairs of shoes, the sizes, styles, quality, and price, that he had the right to select the numbers, sizes, styles, qualities, and prices later, and that that made it capable of being rendered certain. A sufficient answer to this contention is that no such selection is made to appear in the record. But to the contrary, the record shows that no such selection was made. If, as a matter of fact, the contract between appellant and appellees was that he gave his order for "$4,000 worth of shoes" to be shipped in the spring of 1920, and with the privilege of later selecting styles, sizes, qualities, and prices, there not being anything in the contract binding appellant to make such selection, then, as a matter of law, the contract was but a unilateral executory agreement, amounting to an option to buy, which was void for want of mutuality. Railway v. Mitchell, 38 Tex. 85; Tyler Ice Co. v. Coupland, 44 Tex. Civ. App. 383, 99 S. W. 133; Oil Co. v. Teel, 95 Tex. 586, 68 S. W. 979; Texas Produce, Ex'r, v. Sorrell (Tex. Civ. App.) 168 S. W. 77; Cold Blast Transportation Co. v. Kansas City Bolt Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696.

Upon the pleading and evidence, no other judgment could have been rendered than was rendered, and it is · therefore affirmed.