**OKC CORP. & OKC Corp. Liquidating Trust, Appellants,**

v.

**UPG, INC., Appellee.**

**No. 05–89–00647–CV.**

Court of Appeals of Texas, Dallas.

Aug. 22, 1990.

Rehearing Denied Oct. 31, 1990.

David C. Musselwhite, Laura L. Rodenburg, Lisa S. Gallerano, Dallas, for appellants.

Stephen R. Anderton, Frank G. McDonald, John R. Guittard, Dallas, for appellee.

Before McCLUNG, LAGARDE and OVARD, JJ.

## OPINION ON MOTION FOR REHEARING

OVARD, Justice.

Our prior opinion dated June 20, 1990, is hereby withdrawn, and the following opinion is substituted in its place on both OKC's and UPG's motions for rehearing.

OKC Corporation and OKC Corporation Liquidating Trust (OKC) appeal from an adverse judgment, rendered after a jury trial, in favor of UPG, Inc. OKC raises forty-two points of error on appeal, partially reiterated in ten counterpoints, which address issues involving: bailiff misconduct, enforceability of contracts, sufficiency of the evidence, exclusion and admission of certain testimony and exhibits, objections to and requests for submitted questions and instructions in the charge to the jury, and the award of prejudgment interest. UPG responds and raises two cross-points of error on appeal. Finding no merit in any of OKC's points of error or UPG's cross-points, we affirm the judgment of the trial court.

OKC Corporation, succeeded by OKC Corporation Liquidating Trust, first began transactions with UPG in 1977. UPG supplied crude oil to OKC for the operation of OKC's refinery at Okmulgee, Oklahoma. The transactions were evidenced by certain written agreements, one of which is the subject of this lawsuit. Pursuant to the March 1979 document, the subject of this lawsuit, UPG delivered various quantities of crude oil, which OKC accepted, to OKC's refinery at Okmulgee, Oklahoma. These deliveries, in varying quantities, occurred on a monthly basis until OKC decided, pursuant to its liquidation process, to sell off some of its refinery-related subsidiaries and their stock and assets. Effective Janu-

ary 2, 1981, Basin Refining, Inc. (BRI) purchased OKC's Okmulgee refinery and its related assets. Thereafter, UPG began delivering crude oil to BRI as it had done for OKC when OKC owned and operated the Okmulgee refinery. In May of 1981, UPG delivered crude oil to BRI for which BRI did not pay. After unsuccessful attempts to collect from BRI, UPG approached OKC for payment, contending that OKC merely assigned the 1979 March document to BRI. UPG's position is that even though OKC sold its refinery and related assets to BRI, OKC still retained the right to crude oil delivery as well as the associated obligation of payment for crude oil delivered, because the March 1979 document was *assigned* and not sold to BRI. Thus, UPG maintains that, pursuant to the general law of assignments, OKC was secondarily liable for payment for the crude oil deliveries and since BRI was unable to pay, OKC must now pay for the crude oil delivered to BRI. It is OKC's position that when it sold its refinery and related assets, it completely divested itself from refinery operations, including any obligations for payment of crude oil pursuant to the March 1979 document. Further, OKC argues that the March 1979 document was not a contract, but merely an agreement to agree at a later date for future crude oil transactions. OKC places great emphasis on the fact that the March 1979 document fails to mention a specific quantity of crude oil that shall be delivered by UPG to BRI each month. In light of the aforementioned factual background giving rise to this suit, we now address OKC's arguments.

## BAILIFF MISCONDUCT

■ In points of error one and two, OKC argues that certain actions by the bailiff, Donna Peden, during the jury deliberation process, constituted misconduct of such a grave nature as to warrant a reversal. Additionally, OKC contends that the trial judge, in whose court the alleged misconduct occurred, abused his discretion in not recusing himself from the bailiff misconduct hearing. Specifically, OKC directs our attention to the fact that during deliberation, a question arose concerning the

meaning of "mitigation of damages" and "failure to mitigate" as employed in the charge. A note was prepared by the presiding juror and shown to the bailiff. Instead of passing the note to the judge for his decision, the bailiff told the jurors that if any of the terms used in the charge had a specific legal meaning, those words would have been defined in the charge. The bailiff then stated that for undefined words, the jurors were supposed to use the common, ordinary, and everyday meaning of the words.

In order to obtain a new trial on the basis of juror or bailiff misconduct, the complaining party must show: (1) that the misconduct occurred; (2) that it was material; and (3) that, based on the record as a whole, the misconduct probably resulted in harm to the complainant. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 419 (Tex.1985); *Flores v. Dosher*, 622 S.W.2d 573, 574 (Tex. 1981); *Baker Marine Corp. v. Weatherby Engineering Co.*, 710 S.W.2d 690, 691 (Tex. App.—Corpus Christi 1986, no writ); TEX. R.CIV.P. 327(a). The alleged misconduct occurred during the deliberation process, prior to any voting. Specifically, while discussing question number six concerning mitigation of damages, some confusion arose regarding the meaning of "mitigate," as used in the question. The question reads as follows:

QUESTION NO. 6

Did UPG fail to mitigate its damages, if any, resulting from Basin's failure to pay for crude oil delivered in May, 1981?

Answer "Yes" or "No."

ANSWER: <u>No</u>

The burden of proof for this question is on OKC.

In answering this question you are instructed that a party who has sustained damages from a breach of contract has a duty to use reasonable diligence to minimize its damages, but is not required to sacrifice a substantial right of its own. The duty to minimize damages does not arise until the injured party has notice of a breach or repudiation of the contract.

A note was prepared by the presiding juror, Linda Yohe, to show the bailiff the

juror's concern regarding certain words used in the question. The note reads as follows: "We are in disagreement as to the definition of the word 'mitigate' and as to its use in the phrase 'fail to mitigate.'" Regarding the conversation and conduct between Linda Yohe, the presiding juror, and Donna Peden, the bailiff, concerning the mitigation note, the record reflects that, at the hearing on OKC's motion for new trial, Yohe testified that, "I had the note in my hands and had it opened and she [Peden] read the note." Yohe continued, "I don't recall if it [the note] was—actually passed hands, whether she actually took full possession of it. I know she read the note." Later Yohe concluded:

I still had the note in my possession, and that's why I said I don't recall if when I gave her—I feel certain that because I ended up with it, that she read it while I was holding it in my hand, I feel fairly certain, but that's still kind of fuzzy. But I ended up with the note.

Yohe later stated that Peden never refused to deliver a note from the jury to the court. Specifically, in Yohe's affidavit, contained in a supplemental transcript in the record, she swore that, "[c]oncerning the mitigation question, the bailiff did not refuse to submit the mitigation note to the judge. After the discussions described in my previous affidavit, the jurors decided it was not necessary to send the note to the Court." From the above-referenced evidence contained in our record, we determine that even if there was an actual, physical delivery of the mitigation note by Yohe to Peden, a subject on which Yohe seems ambivalent at best, Peden never refused to and was not requested to deliver the note to the court.

According to the affidavit of Yohe, the bailiff read the note and asked the jurors if they knew what the words meant. After some jurors responded affirmatively, the bailiff told the jurors to use the common meaning of the word. The bailiff continued by stating that if the word had a particular legal meaning, it would have been defined in the charge. Because it was not explicitly defined, the bailiff told the jurors to use the common meaning of the word and not to make it (the deliberation process) harder than it had to be.

At the commencement of the charge appears the following admonition:

If words are used in the questions in a sense which varies from the meaning commonly understood, you will be given in this charge the proper legal definition for such words, which you are bound to accept in place of any other definition or meaning....

We consider the words that follow question number six as more of an explanatory instruction rather than a proper legal definition, considering the language used in that instruction as well as the more explicit language used in the definition of other terms in the charge such as "preponderance of the evidence," "waiver," and "constructive knowledge." Having so characterized the explanatory instruction, we treat the bailiff's advice to the jurors as merely a paraphrasing of the admonition which appears at the beginning of the charge.

We determine, as the trial court found, that the action of the bailiff constituted misconduct, and that it was material. Our next inquiry is whether probable harm resulted to the complainant. *Redinger,* 689 S.W.2d at 419. To prove that probable harm resulted, the record must affirmatively reflect that the alleged misconduct most likely caused a juror to vote differently than he "would otherwise have done on one or more issues vital to the judgment." *Id.* at 419 (quoting *Mrs. Baird's Bread Co. v. Hearn,* 157 Tex. 159, 163–64, 300 S.W.2d 646, 649 (1957)). Probable harm has not occurred where "the evidence is such that ... the jury would in all probability have rendered the same verdict that was rendered here,...." *Fountain v. Ferguson,* 441 S.W.2d 506, 508 (Tex.1969) (quoting *Lumberman's Lloyd's v. Loper,* 153 Tex. 404, 410–11, 269 S.W.2d 367, 370–71 (1954) (applying same standard to improper jury argument)).

In claiming that probable harm resulted, OKC directs our attention to *Logan v. Grady,* 482 S.W.2d 313, 321–22 (Tex.Civ.App.—

Fort Worth 1972, no writ). In *Logan*, the jury requested that the bailiff inform the trial court of the jury's desire to hear testimony from a witness who gave conflicting versions of events surrounding an automobile accident. At that point in the deliberation process, the jury was considering the issue of the plaintiff's contributory negligence. The bailiff told the jurors that they had all the information they needed to decide the case and declined to communicate their request for additional testimony to the trial court. *See id.* at 321–22. We distinguish *Logan* from the present case in that in *Logan*, the jury was deprived of additional testimony on a key issue but in the present case, the jury was deprived of nothing. The bailiff's communication, although misconduct, was a restatement of the admonition in the charge and, most likely, was what the trial court would have told the jury had the proper procedures been utilized. Further, the trial court had two opportunities to correct the error had the court considered it reversible—first at the hearing on the bailiff misconduct issue, and secondly, upon presentation of OKC's motion for new trial alleging bailiff misconduct. The trial judge was in the best position to determine whether his bailiff's misconduct warranted a new trial because the trial judge was present during the examination of the witnesses, the presentation of the evidence and the development of the issues. Had the trial judge determined that he would have answered the jurors' question in a manner different from that of his bailiff, he could have declared that probable harm resulted from his bailiff's misconduct and granted a new trial. Because he failed to grant a new trial after the misconduct hearing and after being presented with OKC's motion for new trial, we determine that the trial judge found the misconduct inconsequential in reference to the jury's verdict. Because the case law relied upon by OKC is distinguishable from the present case and because the bailiff's comment was a mere restatement of the charging instructions, we determine that OKC has failed to show that the misconduct of the bailiff resulted in probable harm. Point of error number one is overruled.

■ Having determined that the misconduct did not rise to the level of probable harm, we must now decide whether the trial judge should have recused himself from the hearing on his bailiff's misconduct. OKC contends that because an officer of the trial judge's court committed the misconduct, the trial judge would naturally be biased in favor of his bailiff and, therefore, could not objectively rule on the misconduct issue. OKC relies upon rule 18b(2) of the Texas Rules of Civil Procedure for support of its position, claiming that under these circumstances, the trial judge's "impartiality might reasonably be questioned." Tex.R.Civ.P. 18b(2). UPG maintains, and we agree, that rule 327(a) is the more specific and appropriate rule to apply under these circumstances. Tex.R.Civ.P. 327(a). That rule provides in pertinent part: "When the ground of a motion for new trial ... is misconduct of the jury or *the officer in charge of them*, ... the *court shall* hear evidence thereof...." Tex.R. Civ.P. 327(a) (emphasis added). This rule makes it mandatory for a trial judge to hear evidence of misconduct of the trial court's officers. A trial judge is in the best position to determine, and should be the one to determine, if the alleged misconduct of one of its officers probably harmed one of the parties. Consequently, we determine that neither the judge who heard OKC's motion for new trial based on the recusal issue nor the trial judge abused their discretion in denying OKC's motion. Tex.R.Civ.P. 18a(f). Point of error number two is overruled.

## CONTRACT ENFORCEABILITY

OKC maintains that the March 1979 document, under which OKC and UPG conducted crude oil transactions, was not an enforceable contract as a matter of law because it failed to specify the exact quantity of crude oil which was to be delivered to OKC's refinery each month. UPG maintains that the lack of a specific quantity is not fatal to the enforceability of the document because OKC's and UPG's course of

conduct, pursuant to the document, proves the existence of a contractual intent to be bound by the document.

We begin our analysis by noting the general rule that an agreement silent as to the issue of quantity is not enforceable as a contract. *See, e.g., Weitzman v. Steinberg,* 638 S.W.2d 171, 175 (Tex.App.—Dallas 1982, no writ); *Miller v. Vaughn & Taylor Constr. Co.,* 345 S.W.2d 852, 853 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n.r.e.); *Gordon v. Emerson Shoe Co.,* 242 S.W. 791, 795–96 (Tex.Civ.App.—Beaumont 1922, no writ). We also note that the Uniform Commercial Code (UCC) provides no "gap filler" for a quantity term left out of an agreement, but does supply missing terms dealing with time and place of delivery, as well as price. *See* Tex.Bus. & Com. Code Ann. §§ 2.305, 2.308–.310 (Tex.UCC) (Vernon 1968).

However, courts should strive to hold contracts enforceable, where possible, amidst allegations of uncertainty. *See Dahlberg v. Holden,* 150 Tex. 179, 183, 238 S.W.2d 699, 701 (1951); *Guzman v. Acuna,* 653 S.W.2d 315, 319 (Tex.App.—San Antonio 1983, writ dism'd). Moreover, the UCC provides that a contract is enforceable, even if it fails to satisfy the formal requirements of contract formation, so long as it is valid with respect to goods which have been received and accepted. Tex.Bus. & Com.Code Ann. §§ 2.201(c)(3) and comment 2, 2.204(c) and comment (Tex.UCC) (Vernon 1968). Where goods have been received and accepted, part performance, which will save an otherwise unenforceable agreement, is deemed to have occurred. *See Hutchings v. Slemons,* 141 Tex. 448, 452, 174 S.W.2d 487, 489 (Tex.Comm'n App. 1943, opinion adopted); *Collins v. Williamson Printing Corp.,* 746 S.W.2d 489, 493 (Tex.App.—Dallas 1988, no writ).

■ In our case, it is undisputed that BRI received and accepted the May 1981 crude oil shipment from UPG. Further, the jury found, in response to question number one, that neither OKC nor BRI terminated or cancelled the March 1979 contract entered into by UPG and OKC that was assigned to BRI on January 2, 1981. Moreover, the general rule concerning assigned contracts holds that the assignor does not discharge its liability under the contract upon assignment to the assignee; the assignor remains secondarily liable and must pay under the contract where the assignee is unable to do so. *See Birge v. Community Fin. Corp.,* 380 S.W.2d 754, 756 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r.e.) (assignor of non-negotiable note treated as surety); *W.T. Burton Co. v. Keown Contracting Co.,* 353 S.W.2d 909, 912 (Tex.Civ.App.—Beaumont 1961, writ ref'd n.r.e.) (assignor liable as endorser on non-negotiable instrument unless endorsement qualified). Consequently, we hold that the March 1979 document was a binding and enforceable contract to the extent of the goods delivered to and received and accepted by BRI. We do not reach the issue of whether, had no goods been delivered to BRI, BRI or OKC could have forced, through an action for specific performance, UPG to deliver a certain amount of crude oil, for that issue is not before us.

OKC makes the alternative argument that if the March 1979 document can be treated as an enforceable contract, the evidence established that, as a "matter of law," the contract was not enforceable. In order to prevail upon a "matter of law" evidentiary challenge, the movant must show: (1) that the record fails to establish the fact finder's answer after examining only the evidence favorable to the finding, disregarding any contrary evidence, and, additionally, (2) that the record affirmatively establishes the movant's proposition as a matter of law. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Southern Concrete Co. v. Metrotec Fin., Inc.,* 775 S.W.2d 446, 448 (Tex.App.—Dallas 1989, no writ); *Peat Marwick Main v. Haass,* 775 S.W.2d 698, 706 (Tex.App.—San Antonio 1989, writ granted). After a review of the record, we determine that OKC has failed to meet this burden. Point of error number three is overruled.

## JURY CHARGE ERROR

In numerous points of error, OKC challenges the submitted jury charge on the

basis of questions and instructions which were either allegedly erroneously included or improperly excluded. Specifically, the questions and instructions concern a variety of defensive issues including: contract enforceability, duration, termination, novation, release, waiver, modification, statute of frauds, mitigation of damages, estoppel, and excuse of performance. To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. Alleged error will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment. *Island Rec. Dev. v. Republic of Texas Sav.*, 710 S.W.2d 551, 555 (Tex.1986); *Stewart Title Guar. Co. v. Sterling*, 772 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1989, writ denied); *Southwestern Life Ins. Co. v. Green*, 768 S.W.2d 445, 451 (Tex.App.—El Paso 1989, writ denied); Tex.R.App.P. 81(b)(1). After reviewing the pleadings of both OKC and UPG, the evidence presented at trial, as well as the charge in its entirety, we determine that any jury charge error, if any, was not of such a grave degree as to warrant a reversal. *Island Rec. Dev.*, 710 S.W.2d at 555; Tex.R.App.P. 81(b)(1). Therefore, points of error numbers four, five, seven, eight, fourteen through twenty-two, and twenty-six through thirty-nine are overruled.

## EVIDENCE SUFFICIENCY

In points of error numbers six, nine, and eleven, OKC raises various insufficient evidence, no evidence, and "matter of law" evidence challenges to issues concerning contract expiration, formation, and oil delivery pursuant to the March 1979 contract. As stated earlier, in order to prevail on a "matter of law" evidentiary challenge, the movant must show that: (1) after disregarding all evidence contrary to the finder of fact's finding, the remaining evidence fails to support the finding; and (2) that the record affirmatively establishes the

movant's proposition as a matter of law. *Holley*, 629 S.W.2d at 696. When reviewing a no evidence challenge, an appellate court must only consider the evidence and reasonable inferences drawn therefrom, which, when viewed in their most favorable light, support the jury verdict or court finding. The court must disregard all evidence and inferences contrary to the fact finding. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford*, 726 S.W.2d at 16. In reviewing factual insufficiency points, a court of appeals will consider *all* of the evidence in the record that is relevant to the fact being challenged. The court may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). Because an appellate court is not a fact finder, it may not pass upon the credibility of the witnesses or substitute its judgment for that of the trier of fact. This is true even if there is conflicting evidence upon which a different conclusion could be supported. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

■ OKC raises a "matter of law" challenge contending that the evidence shows that the March 1979 contract expired as a matter of law. When applying the above-mentioned standard of review, together with the facts that the March 1979 contract specifically states that it shall be terminated only by a thirty-day advance written notice and the record fails to contain such a written notice of termination, we hold that the March 1979 contract did not expire as a matter of law. *Holley*, 629 S.W.2d at 696. Point of error number six is overruled.

■ OKC also asserts both no and insufficient evidence challenges maintaining that the crude oil delivered to BRI in May of 1981 was not pursuant to the March 1979 contract and, further, that the March 1979 document was not a contract. After

an examination of the record, the jury's response to question number two, as well as our discussion covering contract enforceability, we determine that the evidence is both factually and legally sufficient to prove that the crude oil delivered to BRI in May of 1981 was pursuant to the March 1979 document and that the March 1979 document was indeed a contract. *Stafford,* 726 S.W.2d at 16; *Cain,* 709 S.W.2d at 176. Points of error numbers nine and eleven are overruled.

## TESTIMONY AND EXHIBITS

■ In several points of error, OKC contends that certain exhibits and witness testimony were either erroneously admitted into or improperly excluded from the evidence. Specifically, OKC maintains that the excluded testimony and exhibits were relevant and that UPG's objections were too general to withstand appellate scrutiny. The excluded testimony and exhibits were properly kept from the evidence because the trial court properly considered them irrelevant to the issues raised by the parties and further, after reviewing the record, UPG's objections were sufficiently specific. Regarding the admitted letter concerning oil supply termination from one of OKC's employees to one of OKC's suppliers, it was properly admitted as evidence that OKC had previously terminated supply contracts and was well aware of the procedure necessary to do so. Moreover, when reviewing a trial court's evidentiary rulings, an appellate court should uphold the ruling if there is any ground for doing so, even if the ground was not urged at the trial court level. *State Bar of Texas v. Evans,* 774 S.W.2d 656, 658 n. 5 (Tex.1989). Further, to obtain the reversal of a judgment based upon error of the trial court in admission or exclusion of evidence, the complainant must show that: (1) the trial court committed error; and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex. 1989); *Bridges v. City of Richardson,* 163 Tex. 292, 354 S.W.2d 366, 368 (1962); Tex. R.App.P. 81(b)(1). After reviewing the

record, we are unable to hold that the trial court committed error in its evidentiary rulings and, furthermore, if any alleged error was committed, it was not of the magnitude to warrant a reversal. *Gee,* 765 S.W.2d at 396. Points of error ten, twelve, thirteen, twenty-three through twenty-five, forty, and forty-one are overruled.

## PREJUDGMENT INTEREST

■ In its final point of error, OKC contends that the trial court's award of prejudgment interest at a rate of ten percent, compounded annually, was erroneous because, as a matter of law, the rate is six percent simple interest. OKC relies upon article 5069–1.03, maintaining that the sum payable is reasonably ascertainable from the account or contract itself. Tex.Rev.Civ. Stat.Ann. art. 5069–1.03 (Vernon 1987). UPG maintains that the sum payable is not readily ascertainable from the March 1979 contract; therefore, the more general article, 5069–1.05, is applicable. Tex.Rev.Civ. Stat.Ann. art. 5069–1.05 (Vernon 1987). Article 5069–1.03 provides:

> When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987). After a review of the March 1979 contract, under which UPG and OKC operated for several months and which is the focus of this lawsuit, we cannot locate any language which "ascertains the sum payable." Tex.Rev.Civ.Stat.Ann. art. 5069–1.03. Moreover, the Texas Supreme Court has held that article 5069–1.03 does not apply to a determination of prejudgment interest in a case where the contract provides no guidance in ascertaining the measure of damages suffered by a party to the contract. *Rio Grande Land & Cattle Co. v. Light,* 758 S.W.2d 747, 748 (Tex.1988); *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930 (Tex.1988); *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554

(Tex.1985). The March 1979 contract is silent as to the measure of damages; therefore, article 5069–1.05 provides the applicable rule for calculating prejudgment interest, and the trial court's award of prejudgment interest at the rate of ten percent per annum was proper. *Rio Grande Land & Cattle Co.*, 758 S.W.2d at 748; TEX.REV.CIV. STAT.ANN. art. 5069–1.05, § 2 (Vernon 1987). Point of error number forty-two is overruled.

### UPG's CROSS–POINTS

■ In its response to OKC's brief, UPG raises two cross-points of error. First, UPG maintains that the prejudgment interest awarded should have been compounded on a daily, rather than an annual basis. Second, UPG contends that the trial court's judgment is not complete because it fails to name the trustee of OKC Corporation Liquidating Trust. We will first address UPG's cross-point concerning the compounding of prejudgment interest and then we will discuss the absence of the trustee's name in the judgment.

Pursuant to our discussion under point of error number forty-two, we hold that the award of prejudgment interest at the rate of ten percent per annum was proper. UPG contends that the interest awarded should have been compounded on a daily, rather than an annual basis. UPG places great emphasis, in its brief, upon the *Cavnar* and *Wolfe* cases for support of its proposition. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d at 553–54; *City of Houston v. Wolfe*, 712 S.W.2d 228, 229–30 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd). In a wrongful death action the *Cavnar* Court held, "We therefore hold that, as a matter of law, a prevailing plaintiff *may* recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment." *Cavnar*, 696 S.W.2d at 554 (emphasis added and emphasis in original removed). In authorizing the award of prejudgment interest, compounded daily, in an eminent domain action, the *Wolfe* court stated, "As we read *Cavnar*, this well-founded concern has dissolved: as a matter of law, in all types of cases, awards of

prejudgment interest *shall* be compounded on a daily basis. No longer is the compounding period left to the discretion of the trial courts." *Wolfe*, 712 S.W.2d at 229 (emphasis added). UPG's reliance upon *Wolfe* is almost as misguided as is the *Wolfe* court's interpretation of *Cavnar*. The *Wolfe* court takes the discretionary language of *Cavnar* (*i.e.* "a prevailing plaintiff *may* recover prejudgment interest compounded daily") and somehow transforms it into a non-discretionary mandate ("awards of prejudgment interest *shall* be compounded on a daily basis") for trial courts. Not only is this in contravention of the specific language of *Cavnar* but it is also in contravention of the applicable statutes. *See* TEX.REV.CIV.STAT.ANN. arts. 5069–1.03 (providing for per annum compounding), 5069–1.05 (silent on compounding) (Vernon 1987). In light of the facts that: (1) article 5069–1.05 is silent on the matter of compounding of interest; (2) UPG relies upon the *Wolfe* court's misinterpretation of *Cavnar;* and (3) the dispute between OKC and UPG is contractual in nature, rather than a tortious wrongful death action addressed in *Cavnar*, we hold that the trial court's annual compounding of prejudgment interest was proper. UPG's cross-point of error number one is overruled.

■ In its second cross-point of error, UPG maintains that the judgment should have named the trustee of OKC Corporation Liquidating Trust, Daniel J. Sherman, as one of the liable defendants. Originally, the judgment referred to Daniel J. Sherman in the following language, "[t]hrough its Trustee Daniel J. Sherman...." However, upon motion by OKC, the judgment was modified to delete any reference to Sherman because, as OKC contended, Sherman did not *replace* Charles E. Redwine (the predecessor trustee) because the liquidating trust had terminated and Sherman was merely appointed by the bankruptcy court as bankruptcy trustee over the estate of the liquidating trust, pending the bankruptcy proceedings. UPG argues that because the judgment names only the liquidating trust without naming its trustee, the

judgment is ineffective, as a trust is not a legal entity. UPG, however, cites authority which holds that in certain situations, the trustee of a trust need not be specifically named to hold the trustee liable. Without ruling on the scope of the judgment, we note that the cross-point has not been preserved for appellate review. When OKC presented the trial court with its motion to modify the judgment so as to delete any reference to Sherman, UPG could have opposed that motion presenting the same arguments that it now asserts in our Court. UPG contested the judgment on the compounding of interest issue but chose to remain silent on the trustee issue until now. In order to make a valid claim in an appellate court, that claim must first be made in the trial court to give that court an opportunity to correct its error. *San Jacinto River Auth. v. Duke,* 783 S.W.2d 209, 210 (Tex.1990); *McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72, 73 (Tex. 1989); TEX.R.APP.P. 52(a). Because UPG is raising this point for the first time on appeal, it is not properly before this Court. Consequently, UPG's second cross-point of error is overruled.

The trial court's judgment is affirmed.

Dissenting opinion by McCLUNG, J.

McCLUNG, Justice, dissenting.

I respectfully dissent. The majority treats this very grave, serious, and forbidden misconduct of this bailiff as insignificant and of no consequence. I view it as a most flagrant violation of due process. The trial court should have granted the motion for new trial. Prompt recognition of the obvious harm emanating from a sequence of events such as occurred probably accounts for the scarcity of authoritative cases. I find it somewhat perplexing that this case has worked its way up the judicial ladder to this point, and somewhat astonishing that the majority can casually determine no harm occurred since what the bailiff said was "most likely, what the trial court would have told the jury had the proper procedures been utilized." I do not enjoy the benefit of such clairvoyance. There is absolutely nothing in this record

to support that statement. Readers can only speculate as to its source and reliability.

The majority draws a distinction between the facts of this case and those in *Logan v. Grady,* 482 S.W.2d 313 (Tex.Civ.App.—Ft. Worth 1972, no writ). Because the facts of two cases are not identical is not a proper basis to draw a distinction where the underlying legal principle is virtually identical in both cases, such as we have here. Reading beyond the syllabus and head notes of *Logan* reveals there were two interrelated errors analyzed by the court, and both errors supported reversing the trial court and remanding for new trial.

*Logan* involved a head-on automobile accident. Contributory negligence of the plaintiff was the keystone of the defense. The *Logan* court first addressed the fact that the trial court admitted a written statement from a non-party witness who also testified at trial. After extensive analysis, the *Logan* court held the admission of the statement harmful, reversible error because the statement contained many inadmissible conclusions. During deliberation, a juror noted some differences between the written statement exhibit and the oral testimony of the witness. The jury requested they be allowed to hear the oral testimony again. The bailiff failed to communicate this request to the court. The *Logan* court noted that this failure caused the jury to have before it inadmissible evidence bearing on the issue of contributory negligence. *Id.* at 320. The bailiff instructed the jury that its members already had all it needed. The *Logan* court held this transaction prejudicial and reversible error, also. *Id.* at 322.

The majority misinterprets the holding of the *Logan* court. They suggest the decision turned on the jury being deprived of testimony of a key witness. I read the case to say the jury was given inadmissible evidence which was overemphasized by a trial error of the bailiff that had a direct bearing on a pivotal issue before the jury. Thus, prejudice arose.

I turn now to our case. The majority takes the cavalier position that *the jury*

*was deprived of nothing.* I suggest that *the jury was deprived of everything.* The jury was denied contact with the judge. The jury was isolated and denied the right of direct communication with the judge. The jury was denied the right of freedom from outside influence. The jury was denied the right of freedom from unauthorized communication. The jury was denied the opportunity to make an *informed decision* on all issues.

The issue of mitigation of damages was a hotly contested question of fact at trial. This was a key issue of appellant's defense. The very nature of the question the jury addressed to the court suggested they had already found against appellant on the contract dispute, and were considering damages. The jury note specifically set out that there was a disagreement among them. Although the note indicated this, the bailiff then polled the jury by asking if they knew the meaning of the term. After *some* said they did, the bailiff then instructed the jury to go with the common use of the words, and not make it harder than it had to be. The obvious result is that the bailiff's instructions made some jurors unauthorized "secret witnesses" to the other jurors on the proper meaning of the terms. *See Central Power & Light Co. v. Freeman,* 431 S.W.2d 897, 898 (Tex. Civ.App.—Corpus Christi 1968, writ ref'd n.r.e.). Once a jury requests information, it becomes the duty of the court to respond. *Taylor v. Lewis,* 553 S.W.2d 153, 159 (Tex. Civ.App.—Amarillo 1977, writ ref'd n.r.e.) (on rehearing). The jury was deprived of its right to hear the court's response.

The undisputed evidence at the motion for new trial established conclusively that the jury bailiff violated rules 283 and 285 of the Texas Rules of Civil Procedure. The trial court found such violation to be error, and that it was a material error. This is uncontroverted. Our standard of review to determine harm requires that we not only review the evidence presented at the motion for new trial, but also the entire record as a whole. *Texas Power & Light Co. v. Hering,* 148 Tex. 350, 353, 224 S.W.2d 191, 192 (1949).

A review of the testimony at trial reveals that T.J. Strange, UPG's manager of supply and marketing, testified that he knew of Basin's financial problems at least in April 1981, maybe as early as March 1981. When he discovered that collecting from Basin would probably be difficult he recommended that UPG immediately collect what was owed and stop delivering crude oil to Basin. Other testimony described the deliberate and accelerated efforts made from May 15 to May 27 to collect from Basin what was owed for the month of April. Carl Smith, UPG's operations manager, testified that had they terminated deliveries on May 15, UPG's losses could have been cut in half. Logically, then, had UPG followed Strange's recommendation at the time he made it, UPG might not have lost anything. Since there is probative evidence about the lack of mitigation in the record, the jury may have answered question six as it did because the jury did not know the meaning of the word "mitigation." They were confused and needed help from the judge to clarify. It was harm to deny them access to the trial court. The trial error committed by the bailiff had a direct bearing on a pivotal issue. But for the conduct of the bailiff, the note would have been sent to the trial court. As it was, the trial court never had the opportunity to do its duty. Even if the majority is correct in assuming that the trial court would have said nothing more or different from the bailiff, it is unnecessary to engage in such conjecture as the damage was done when the misconduct occurred. The jury was left free to misconstrue the meaning of the word "mitigation." Harm arose because the jury answered a hotly contested issue out of ignorance. I maintain it was the misconduct, not the evidence, that caused the jury to answer the mitigation issue adversely to OKC.

In addition to failing to examine the entire record, the majority's harm analysis suffers another fatal flaw. Instead of actually focusing on any harm caused to OKC, the majority focused on the effect the bailiff's statements had on the mental processes of the jurors. We are not to consider the jurors' mental processes. But

regardless of the mental processes used to arrive at their answer, the real problem is that they were ill-informed. Under the Rules of Appellate Procedure we are to reverse if the error complained of on appeal probably caused rendition of an improper judgment. TEX.R.APP.P. 81(b)(1). I maintain that an improper judgment is one rendered by a misinformed or ill-informed jury.

A jury has the statutory right to receive additional instructions and the trial court has the duty to give them when requested. TEX.R.CIV.P. 285, 286. Further, both parties or their attorneys should be notified of the jury's request for additional instructions and given notice of, and an opportunity to object to, all supplementary instructions given by the trial court. *Scroggs v. Morgan*, 133 Tex. 581, 586, 130 S.W.2d 283, 286 (Tex. Comm'n App. 1939, opinion adopted).

While I do not assert, that but for the misconduct of the bailiff, the jury would have returned a different verdict by answering issue No. 6 differently, I am mindful that the intent and purpose of Rule 81(b)(1) is not to require that the complaining party demonstrate that, but for the error, a different judgment would have resulted. If the error had such force as would be reasonably calculated to have affected the jury finding in question, the complaining party has suffered harm through the error and is entitled to a reversal on appeal.

Here, the jury returned a verdict finding that OKC did not fail to mitigate. It was only because the jury answered this issue as it did that the judgment was as large as it was. Because the bailiff took it upon herself to give the jury additional instructions, the jury was deprived of their right of direct communication with the trial court; their right to hear and benefit from what the trial judge would have said; the right to have the judge fulfill his obligation to respond; the right to have the officer in charge properly discharge her duty and not interfere with their confidential deliberations. In the aggregate, this means that

OKC received a materially unfair trial under the circumstances.

I would reverse the judgment and remand to the trial court.

## SUPPLEMENTAL DISSENTING OPINION

McCLUNG, Justice, dissenting.

After considering the new opinion issued by the majority on motion for rehearing, I abide by my dissenting opinion issued on June 20, 1990.