AGRI-SCAN V. WOOTAN 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 



ON MOTION FOR REHEARING


 




NO. 3-90-013-CV





BRAD R. BRADLEY AND AGRI-SCAN CORPORATION,



 APPELLANTS


vs.





M. J. WOOTAN, ET AL.,



 APPELLEES



 




FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT



NO. 8414, HONORABLE D. V. HAMMOND, JUDGE PRESIDING



 




 The opinion issued by this Court on July 1, 1992, is withdrawn and the following
is filed in lieu thereof.

 This is a fraud and deceptive-trade-practices case. M. J. Wootan and Wootan's
Farm & Ranch Center, Inc. (collectively, "Wootan Farm Center") brought suit against Brad R.
Bradley and Agri-Scan Corporation (collectively, "Agri-Scan"), alleging fraud, constructive trust,
and tortious interference with contract. Thereafter, Jan Yates Boultinghouse and Llano Feed Mill,
Inc. (collectively, "Llano Feed Mill") filed a plea in intervention as a party plaintiff against Agri-Scan alleging fraud, constructive trust, rescission of contract, reformation of contract, waiver of
forfeiture, and violations of the Deceptive Trade Practices-Consumer Protection Act (DTPA),
Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (1987 & Supp. 1992). Trial was to a jury, which
found in favor of Wootan Farm Center and Llano Feed Mill on all relevant issues. In accordance
with the verdict, the trial court rendered judgment against Agri-Scan. Agri-Scan perfected this
appeal; we will affirm.

 In twenty-two points of error, Agri-Scan argues that: (1) certain questions and
definitions in the jury charge were erroneous; (2) there was either no evidence or insufficient
evidence to support the jury's verdict on the issues of fraud, confidential relationship,
unconscionable conduct or course of conduct, deceptive trade practices, and Agri-Scan's ability
and willingness to sell certain property; (3) the trial court had no basis in law for imposing a
constructive trust on the property in question; (4) the trial court erred in its submission of issues
on attorney's fees; (5) the trial court's declaration concerning the forfeiture of certain
improvements on the subject property was contrary to the law, evidence, and the jury's verdict;
(6) the trial court erred in rescinding the contract between Agri-Scan and Boultinghouse for the
sale and purchase of the property in question; and (7) the trial court erred in failing to grant Agri-Scan's motion for a mistrial based on juror misconduct.


BACKGROUND


 The facts in this case were hotly disputed. In 1971 Southern Pacific Railroad
Company leased a portion of its railroad right-of-way in Llano County to M. J. Wootan. This
tract of land was located east of Highway 16 in the City of Llano and will be referred to as the
"Gray's Feed Store Property." In 1973 Southern Pacific and M. J. Wootan entered into a
supplemental lease agreement wherein Southern Pacific leased an additional portion of its railroad
right-of-way to Wootan. This additional tract was located almost directly across Highway 16 from
the Gray's Feed Store Property and will be referred to as the "Llano Feed Mill Property."

 In 1978 Southern Pacific entered into a new lease with Wootan's Farm & Ranch
Center, Inc., a company in which M. J. Wootan was the sole stockholder. This new lease
included the Gray's Feed Store Property and the Llano Feed Mill Property contained in the
previous leases and also included additional land on the west side of Highway 16.

 In 1985 Southern Pacific entered into another lease with Wootan's Farm & Ranch
Center, Inc. This new lease included the property that was contained in the 1978 lease; however,
the lease also included still more property on the west side of Highway 16, again increasing the
size of the Llano Feed Mill Property under the lease.

 Beginning in 1971, when he first began entering into leases with Southern Pacific,
Wootan purchased or constructed improvements on the Gray's Feed Store Property for the
purpose of operating a feed business. The jury found the fair market value of these improvements
to be $250,000.

 Beginning in 1973, when he first began leasing the Llano Feed Mill Property from
Southern Pacific, Wootan also purchased or constructed improvements on that property as well. 
Further, in 1985, Wootan's Farm & Ranch Center, Inc. entered into an agreement with Llano
Feed Mill, Inc., a company owned by Ken and Jan Boultinghouse, wherein the parties embarked
on a joint business venture of manufacturing feed and fertilizer. The business was known as the
Llano Feed Mill. Under the 1985 agreement, the business was located on the Llano Feed Mill
Property that Wootan was leasing from Southern Pacific. Wootan agreed to manage the Llano
Feed Mill business and allow the business to use the equipment, buildings, and other
improvements that Wootan had already purchased or constructed on the Llano Feed Mill Property. 
Llano Feed Mill, Inc. agreed to pay for the construction or purchase of additional buildings or
equipment that were necessary to operate the business. The Llano Feed Mill was in full operation
by spring 1986. The jury found the fair market value of the improvements owned by Wootan
Farm Center and Llano Feed Mill on the Llano Feed Mill Property to be $4,500,000.

 The present controversy had its origins in the summer of 1986, when it was
rumored that Southern Pacific had sold some of its railroad right-of-way in Llano County to the
City of Austin. Because Wootan Farm Center and Llano Feed Mill owned improvements worth
more than $4.5 million located on property that Wootan Farm Center was leasing from Southern
Pacific, M. J. Wootan contacted Southern Pacific about purchasing that right-of-way. During the
same period, Brad R. Bradley, hearing the same rumors and acting as president of Agri-Scan
Corporation, contacted Southern Pacific for the purpose of acquiring by purchase the excess
railroad right-of-way in Llano County that Southern Pacific had not sold to the City of Austin.

 Wootan heard rumors that Bradley was trying to buy all of the excess railroad right-of-way in Llano County. Therefore, in August 1986 Wootan went to Bradley's office to discuss
the matter. Wootan testified that at that meeting he told Bradley that he was interested in buying
only the portion of the right-of-way that he had been leasing from Southern Pacific, i.e., the
Gray's Feed Store Property and the Llano Feed Mill Property. Wootan then testified to the
following:


Q: And what did Mr. Bradley say when you told him you'd certainly like to
buy that part that you had your business --


A: He said that they [Southern Pacific] wanted to sell it [the railroad right-of-way] all together to one person and that me [I should] let him buy it all and
he'd sell me the part that I wanted under the feed mill at an appraised
market value cost.


 And I said, well, that makes sense. If I start bidding on it and
you're bidding on it, they're going to go up on the price, double right
away.


 And I said, will you sign a contract to that?


 And he said, yeah, sure will.


Q: Were you all talking about the improvements or just the land under it?


A: Just the land.


 Wootan testified that he called Wade Hutto from Bradley's office and told Hutto
that he and Bradley had agreed that Bradley would buy all of the excess railroad right-of-way in
Llano County from Southern Pacific, and then Bradley would convey the Gray's Feed Store
Property and the Llano Feed Mill Property to Wootan for its unimproved appraised market value. 
Wootan then told Hutto to write a contract reflecting the agreement. Wootan further testified that
later that same day, he and Bradley and Hutto met at Hutto's office for the purpose of signing the
contract. However, when presented with the contract, Bradley refused to sign it, saying that his
lawyer advised him not to sign because he did not yet own the property. Wootan then testified
that he suggested that they just write such a contingency into the contract; however, Bradley said
there was no need and told Wootan, "I'm going to treat you right," and "[Y]ou're going fishing
and don't worry about it, just go on down there to Del Rio and have a good time and quit
worrying about it." When asked what he thought Bradley meant when Bradley said, "I'm going
to treat you right," Wootan testified he understood that to mean Bradley would honor their
agreement and sell him the Gray's Feed Store Property and the Llano Feed Mill Property for its
unimproved appraised market value.

 There was evidence that Wootan had made several attempts to purchase the
property from Southern Pacific; however, Wootan testified that after he and Bradley entered into
their agreement, he no longer tried to purchase the land from Southern Pacific. In fact, both
Wootan and a representative of Southern Pacific testified that Wootan told Southern Pacific that
he had discussed the matter with Bradley and that it was all right to go ahead and convey the
property to Bradley.

 During the first week in September 1986, following the August meetings between
Bradley and Wootan, Bradley called Jan Boultinghouse regarding the Llano Feed Mill Property. 
Boultinghouse testified that during that phone conversation Bradley "told us that he, he guessed
we had heard that he bought the railroad property and that he just wanted to call us to reassure
as [sic] that we didn't have anything to worry about, not to get excited, that he was going to treat
us right." Following this phone conversation, Bradley sent Boultinghouse a copy of the contract
discussed above that Wootan had tried to get Bradley to sign. Bradley also attached to the
contract a note that stated:


Kenneth and Jan [Boultinghouse]. When I talked to you on the phone last night
about the railroad property, I failed to mention that M.J. [Wootan] had been trying
to buy from me. And I had thought that he was trying to buy for your partnership. 
Anyway, I discovered . . . yesterday that that was not the case. I had forgotten
about M.J. bringing the attached contract by for me to sign which was around the
first of August. In looking at it, it shows M.J.'s name as the buyer and not your
partnership. I just thought that both of you would be interested in knowing and
seeing this contract.


 Boultinghouse testified that following her telephone conversation with Bradley and
the receipt of this note and contract from Bradley, she believed that Bradley owned the Llano Feed
Mill Property at that time. She also testified that the note from Bradley and the attached contract
led her to believe that Wootan was trying to double-cross her and buy the land where the Llano
Feed Mill was located. (The partnership between Wootan and Boultinghouse was already strained
due to cost overruns on the Llano Feed Mill project.)

 Within a week following the events discussed above, Jan and Ken Boultinghouse
met with Bradley in his office. Jan Boultinghouse testified to the following concerning that
meeting:


 And he [Bradley] said, you know, I know you all are here because, about
the railroad property and he [sic] said that's what we were there about.


 And he told us, don't worry about that.


 He said I guess I could hold you up on the price or I could sell it to
somebody else but I'm not going to.


 I'm going to sell this land to you. I'm going to sell this land to you . . . at
a reasonable price.


 . . . .


 [H]e [Bradley] asked about how our deal was going with M.J. [Wootan].


 I said I was real unhappy about the cost and everything.


 And he said he knew how, how I felt because he had had his own problems
with M.J. Wootan.


 He said that M.J. had stuck his nose in his business years ago when he and
Terry were buying hogs together.


 He said he and Terry had a problem and that they worked it out but that
M.J. couldn't keep his nose out of it.


 And he said it ended up causing . . . an embarrassment . . . .


 And that he had set out to do this whole deal, he had worked years.


 He told us exactly how long, but it was like over a period of a couple of
years or more to get this property bought just so he could ruin M.J.


 That was what he was going to do. That was his, he wanted the other
property along with it but he wanted to ruin M.J. Wootan. That's why he set out
to do this.


 And so he said, you know, when he found out that [Ken] and I were in this--when he started out to get this to ruin M.J., the mill was just sitting there, you
know.


 And then during this negotiations, [Ken] and I got in and got our money in
it.


 And he said, you know, that that's what he did it for but he wasn't going
to hurt us.


 He said, I'm going to sell that land to you all. I'm not going to hurt you
all.


 He said, it's taken away from what I set out to do but said I'm not going
to hurt you all. We're friends. We have got to all live in this little town and I'm
going to treat you right.


 Following this initial meeting in September 1986, Ken and Jan Boultinghouse met
with Bradley in his office on several occasions over the next couple of months. Boultinghouse
testified that during each of these meetings, Bradley would reassure them that he was going to
treat them right and sell them the property, but when asked what price he wanted for it, he said
he would not know how much until he had it surveyed. Finally, on or about November 11, 1986,
the Boultinghouses sent a bid letter to Bradley and offered to buy the property from him for
$65,000. Bradley, however, made no response to the bid letter. Despite repeated attempts by the
Boultinghouses to buy the property from Bradley, he would merely respond that he was still
waiting on the surveyor to finish, but not to worry because he would treat them right and sell it
to them.

 On or about October 14, 1986, Bradley entered into an earnest-money contract with
Southern Pacific for the purchase of the excess railroad right-of-way property in Llano County. 
On or about December 31, 1986, Southern Pacific sold all of its excess right-of-way in Llano
County to Bradley for $2400 per acre. Bradley put legal title to the property in the name of Agri-Scan Corporation. The property Bradley purchased from Southern Pacific included the Gray's
Feed Store Property and the Llano Feed Mill Property. (1)

 Wootan testified that after he found out Bradley had made a deal with Southern
Pacific, he went to Bradley's office to discuss obtaining an appraiser to appraise the Gray's Feed
Store Property and the Llano Feed Mill Property so that Bradley could convey the property to
Wootan. However, Bradley refused to sell the property to Wootan. Instead, Bradley presented
Wootan with a written lease for the Gray's Feed Store Property at a rate of $175 per month.

 In February 1987 the Boultinghouses entered into a lease with Bradley for the Llano
Feed Mill Property at a rate of $1,183 per month. Jan Boultinghouse testified that she entered
into this lease only to cover the time until Bradley sold the property to them. She also testified
that over the next several months after signing the lease, she attempted to buy the property from
Bradley; however, his only responses were "Don't worry" and "I'll treat you right." Finally,
around June 2, 1987, the Boultinghouses sent another written offer of $65,000 to Bradley. 
Bradley did not accept this offer; instead, in July 1987, he offered to sell the Llano Feed Mill
Property to the Boultinghouses for $787,000. At $2,400 per acre, however, Bradley had paid
Southern Pacific less than $4,000 for the 1.583 acres contained in that tract. Jan Boultinghouse
entered into an earnest-money contract at the price of $787,000; however, she never closed the
deal.

 At the end of December 1987, Bradley notified Jan Boultinghouse and Llano Feed
Mill, Inc. that the lease on the Llano Feed Mill Property would not be renewed on its expiration
in February 1988 and requested that the premises be vacated at that time. This lawsuit followed.

 The jury found that Agri-Scan had committed fraud against Wootan Farm Center
based on Bradley's promise to sell the Gray's Feed Store Property and the Llano Feed Mill
Property to Wootan for the fair market value of the land, excluding improvements. The jury also
found that Agri-Scan had committed fraud against Llano Feed Mill by: (1) misrepresenting that
Bradley would sell the Llano Feed Mill Property to Jan Boultinghouse for the fair market value
of the land only, excluding improvements; and (2) misrepresenting to Jan Boultinghouse that
Bradley owned the Llano Feed Mill Property before he had entered into the earnest-money
contract with Southern Pacific to buy the property in October 1986. The jury found that Agri-Scan had knowingly engaged in an unconscionable action or course of action in the sale of the
Llano Feed Mill Property to Jan Boultinghouse. The jury also found that Agri-Scan had
knowingly engaged in false, misleading, or deceptive acts or practices in contracting to sell the
Llano Feed Mill Property to Jan Boultinghouse.

 As for the value of the property in question, the jury found the fair market value
of the improvements located on the Llano Feed Mill Property to be $4,500,000. The jury found
the fair market value of the Llano Feed Mill Property (land only) to be $53,643. The jury found
the fair market value of the Gray's Feed Store Property (land only) to be $7,288 and found the
fair market value of the improvements located thereon to be $250,000.

 Based on the jury's unanimous verdict, the trial court rendered judgment imposing
a constructive trust on the Gray's Feed Store Property for the benefit of Wootan Farm Center, and
imposing a constructive trust on the Llano Feed Mill Property for the benefit of both Wootan
Farm Center and Llano Feed Mill. The judgment ordered Agri-Scan to convey the Gray's Feed
Store Property to Wootan Farm Center for $7,288. The judgment also ordered Agri-Scan to
convey the Llano Feed Mill Property to Wootan Farm Center and Llano Feed Mill for $53,643. 
The judgment also rescinded the July 1987 earnest-money contract between Jan Boultinghouse and
Agri-Scan. The judgment declared that Wootan Farm Center owned the improvements on the
Gray's Feed Store Property and that Wootan Farm Center and Llano Feed Mill jointly owned the
improvements on the Llano Feed Mill Property. Further, based on the jury's verdict, the
judgment awarded Wootan Farm Center $140,000 in punitive damages, as well as $76,398 in
attorney's fees. The judgment also awarded Jan Boultinghouse $100,000 for mental anguish
suffered by her, as well as $280,000 in punitive damages against both Bradley and Agri-Scan, for
a total of $560,000 in punitive damages. The judgment also awarded Llano Feed Mill $138,550
in attorney's fees.


FRAUD


 In its third, fourth, seventh, and eighth points of error, Agri-Scan challenges the
legal and factual sufficiency of the evidence to support the jury's verdict that Agri-Scan committed
fraud against Wootan Farm Center and Llano Feed Mill. In reviewing the legal-sufficiency point,
we must examine the record in the light most favorable to the finding to determine if there is any
probative evidence, or reasonable inferences therefrom, which support the finding, and we must
disregard all evidence or reasonable inferences therefrom to the contrary; if more than a scintilla
of probative evidence exists to support the finding, then the legal-sufficiency challenge fails. 
Lewelling v. Lewelling, 796 S.W.2d 164, 166 (Tex. 1990); Raw Hide Oil & Gas, Inc. v. Maxus
Exploration Co., 766 S.W.2d 264, 275-76 (Tex. App. 1988, writ denied). In reviewing the
factual-sufficiency point, we must examine the entire record to determine if there is some
probative evidence to support the finding; if there is, we must then weigh and consider all the
evidence, both in support of and contrary to the challenged finding, to determine whether the
evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight
of the evidence as to be clearly wrong and manifestly unjust. Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986); Raw Hide Oil & Gas, Inc., 766 S.W.2d at 275-76. We are not free to substitute our
judgment for that of the jury simply because we may disagree with the jury's verdict. Pool v.
Ford Motor Co., 715 S.W.2d 629, 633-34 (Tex. 1986).

 The elements of fraud are: (1) a material representation; (2) that was false; (3) that
was either known to be false when made or was asserted without knowledge of its truth or falsity;
(4) that was intended to be acted on; (5) that was relied on; and (6) that caused injury. DeSantis
v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990), cert. denied, 111 S. Ct. 755 (1991).

 Having reviewed the record, we conclude that there was both legally and factually
sufficient evidence to support the jury's verdict concerning fraud. There was evidence that
Bradley represented to Wootan Farm Center that he would sell the Gray's Feed Store Property
and the Llano Feed Mill Property to Wootan Farm Center for its unimproved fair market value. 
There was also evidence that Bradley represented to Jan Boultinghouse: (1) that he would sell the
Llano Feed Mill Property to her for its unimproved fair market value; and (2) that he owned the
Llano Feed Mill Property prior to October 1986 (that being the time when Bradley entered into
an earnest-money contract with Southern Pacific for the purchase of the property). All of these
representations were false, and there was sufficient evidence that both Wootan Farm Center and
Llano Feed Mill relied on the representations to their detriment. Both parties lost their
opportunity to purchase the property from Southern Pacific, and, because Agri-Scan had
terminated their leases on the property, both Wootan Farm Center and Llano Feed Mill stood to
lose over $4.5 million in improvements.

 As discussed above, there was evidence that a main purpose behind Bradley's
purchase of the Gray's Feed Store Property and the Llano Feed Mill Property was to ruin
M. J. Wootan. Further, by leading Jan Boultinghouse to believe that he owned the land at a time
when he did not, and by telling both Boultinghouse and Wootan that he would sell them the land
for its fair market value, Bradley effectively eliminated both Wootan and Boultinghouse as bidders
for the property when Southern Pacific was trying to sell it. Based on this evidence, the jury
could have inferred that Bradley intended Wootan and Boultinghouse to rely on his
representations. As discussed above, the jury found the fair market value of the Llano Feed Mill
Property itself to be $53,643; however, Bradley attempted to sell Boultinghouse the property for
$787,000.

 Moreover, Bradley himself testified that during the relevant time period he had no
intention of selling the Southern Pacific property to Wootan and Boultinghouse, if he did in fact
acquire it. From the foregoing evidence, and from Bradley's denials that he promised to sell to
Boultinghouse for the fair market value of the unimproved property, the jury could have inferred
that Bradley never intended to keep that promise. See Ferguson v. DRG/Colony North, Ltd., 764
S.W.2d 874, 884 (Tex. App. 1989, writ denied). From the foregoing evidence, and the testimony
that Bradley was seeking to "ruin" Wootan, the jury could have inferred that Bradley never
intended to sell the property to Wootan at all.

 We conclude that more than a scintilla of evidence supports the jury's findings as
to fraud. Moreover, having weighed and considered all the evidence, both in support of and
contrary to the challenged fraud findings, we conclude that the evidence supporting the findings
is not so weak or the answer so contrary to the overwhelming weight of the evidence as to be
clearly wrong and manifestly unjust. Therefore, we overrule Agri-Scan's third, fourth, seventh,
and eighth points of error.




DTPA


 In its twelfth, thirteenth, fourteenth, and fifteenth points of error, Agri-Scan
challenges the legal and factual sufficiency of the evidence to support the jury's verdict that Agri-Scan committed an unconscionable action or course of action or a false, misleading, or deceptive
act that was the producing cause of damages to Llano Feed Mill.

 The DTPA defines "unconscionable action or course of action" to mean "an act or
practice which, to a person's detriment: (A) takes advantage of the lack of knowledge, ability,
experience, or capacity of a person to a grossly unfair degree . . . ." Tex. Bus. & Com. Code
Ann. § 17.45(5)(A) (1987). Taking advantage of a consumer's lack of knowledge to a grossly
unfair degree "requires a showing that the resulting unfairness was glaringly noticeable, flagrant,
complete and unmitigated." Chastain v. Koonce, 700 S.W.2d 579, 584 (Tex. 1985).

 We conclude that there was both legally and factually sufficient evidence to support
the jury's verdict that Agri-Scan engaged in an unconscionable action or course of action as to Jan
Boultinghouse. There was evidence that Boultinghouse was not well versed in business ventures. 
Further, as stated above, there was evidence that Bradley at all times led Boultinghouse to believe
that he owned the Llano Feed Mill Property and that he would sell it to her for its unimproved
fair market value. After months of telling Boultinghouse that he would treat her right, yet failing
to respond to her written offers to purchase, Bradley induced Boultinghouse to enter into an
earnest-money contract for a price of $787,000. Bradley had paid less than $4,000 for the land
that made up the Llano Feed Mill Property, and the jury found the fair market value of that land
to be approximately $53,000. Bradley induced Boultinghouse to enter into the contract by
informing her that he would sell the property to someone else and she would lose her millions of
dollars in improvements. Further, there is evidence that at all times during their negotiations,
Bradley discouraged Boultinghouse from seeking legal counsel.

 Having weighed and considered all the evidence, both in support of and contrary
to the challenged unconscionable-conduct finding, we conclude that the evidence supporting the
finding is not so weak or the answer so contrary to the overwhelming weight of the evidence as
to be clearly wrong and manifestly unjust. Therefore, we overrule Agri-Scan's twelfth and
thirteenth points of error. Because of our conclusion regarding the jury's finding on
unconscionable action or course of action, we need not address Agri-Scan's fourteenth and
fifteenth points of error.


CONSTRUCTIVE TRUST & CONFIDENTIAL RELATIONSHIP


 As stated above, the trial court imposed a constructive trust on the Gray's Feed
Store Property and the Llano Feed Mill Property for the benefit of Wootan Farm Center and
Llano Feed Mill. In their first, second, fifth, and sixth points of error, Agri-Scan argues that the
trial court erred in defining "confidential relationship" in the jury charge and that the evidence is
either legally or factually insufficient to support a jury finding of a confidential relationship
between the parties. In its tenth point of error, Agri-Scan argues that because there was no
confidential relationship between the parties, there was no basis in law for the imposition of a
constructive trust.

 Agri-Scan cites Rankin v. Naftalis, 557 S.W.2d 940, 944 (Tex. 1977), in support
of its argument that before the trial court could impose a constructive trust in the present case,
Wootan Farm Center and Llano Feed Mill had to prove the existence of a confidential relationship
between them and Agri-Scan. We disagree. As discussed above, the jury found that Agri-Scan
committed actual fraud against Wootan Farm Center and Llano Feed Mill, and we have concluded
that such findings were supported by sufficient evidence. The supreme court has stated: "It is
not essential for the application of the constructive trust doctrine that a fiduciary relationship exist
between the wrongdoer and the beneficial owner. Actual fraud, as well as breach of a confidential
relationship, justifies the imposition of a constructive trust." Meadows v. Bierschwale, 516
S.W.2d 125, 128 (Tex. 1974). In Rankin the supreme court noted that the plaintiffs did not
charge the defendants with actual fraud. See Rankin, 557 S.W.2d at 943. Therefore, Agri-Scan's
reliance on Rankin is misplaced.

 We conclude that the jury's finding of actual fraud on the part of Agri-Scan
provided the trial court with a sufficient basis for imposing a constructive trust on the Gray's Feed
Store Property and the Llano Feed Mill Property; therefore, the jury's findings on confidential
relationship are immaterial. Thus, we overrule Agri-Scan's tenth point of error, and we need not
address Agri-Scan's first, second, fifth, and sixth points of error.


PRODUCING CAUSE VERSUS PROXIMATE CAUSE


 In its ninth point of error, Agri-Scan argues that the trial court erred in submitting
issues Nos. 6, 7, and 35a in terms of producing cause instead of proximate cause. First, we note
that issue No. 35a asked the jury whether the fraud, if any, committed by Agri-Scan was a
producing cause of damage to Jan Boultinghouse and Llano Feed Mill, Inc. The jury answered,
"Yes." However, the jury also found that Agri-Scan had violated the DTPA by engaging in false,
misleading, or deceptive acts or practices and by engaging in an unconscionable action or course
of action. The jury further found that Agri-Scan's violations of the DTPA were a producing cause
of damages to Boultinghouse and Llano Feed Mill, Inc. Therefore, any actual or punitive
damages awarded to Boultinghouse and Llano Feed Mill, Inc. were supported by the jury's
findings regarding Agri-Scan's violations of the DTPA; thus, no specific jury finding on causation
was necessary in the context of Agri-Scan's fraud against Boultinghouse and Llano Feed Mill, Inc.

 Issues Nos. 6 and 7 asked the jury to determine whether Agri-Scan's broken
promise, if any, to convey to M. J. Wootan the Llano Feed Mill Property and Gray's Feed Store
Property was the producing cause of injury to Wootan Farm Center. The jury answered "Yes." 
However, in response to issue No. 1 the jury also found that Agri-Scan had committed fraud and
that such fraud was the producing cause of injury to Wootan Farm Center. In neither the trial
court nor this Court has Agri-Scan challenged the use of "producing cause" in Issue No. 1; thus,
it has waived any such argument. See Tex. R. Civ. P. 272 and 274. Therefore, the jury's finding
on issue No. 1 was sufficient to support any actual or punitive damages awarded to Wootan Farm
Center. (2)

 Thus, we conclude that the trial court's submission of issues Nos. 6, 7, and 35a
in terms of "producing cause," if error at all, does not require reversal. We overrule point of
error nine.


SEPARATE ISSUES


 In its eleventh point of error, Agri-Scan argues that the trial court erred in
submitting separately all jury questions regarding the Gray's Feed Store Property. The trial court
is allowed broad discretion in submitting the charge to the jury in the trial of a case. See Lawson-Avila Constr., Inc. v. Stoutamire, 791 S.W.2d 584, 592 (Tex. App. 1990, writ denied); see also
Tex. R. Civ. P. 271-279. Having reviewed the record and noting the complexity of the present
case, we conclude that the trial court did not abuse its discretion in submitting separately the
issues regarding the Gray's Feed Store Property. We overrule Agri-Scan's eleventh point of
error.


ATTORNEY'S FEES


 The jury found and the trial court rendered judgment that Wootan Farm Center was
entitled to $76,398 in attorney's fees and that Llano Feed Mill was entitled to $138,550 in
attorney's fees. In its sixteenth, seventeenth, and eighteenth points of error, Agri-Scan asserts that
the trial court erred in awarding attorney's fees because: (1) there was no basis in law for the
recovery of attorney's fees by Wootan Farm Center; and (2) both the evidence and the trial court
failed to segregate the amount of recoverable attorney's fees between Llano Feed Mill, Inc. and
Jan Boultinghouse, or between the various causes of action brought by them.

 In its fourth amended petition, Wootan Farm Center alleged a cause of action under
the Texas Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (1986 & Supp. 1992), seeking a declaration of its rights with regard to the title of the real
property in question and the improvements thereon. In its final judgment, the trial court rendered
judgment that Agri-Scan held the real property as a constructive trust for the benefit of Wootan
Farm Center and that Wootan Farm Center owned the improvements located on that property. 
Section 37.009 of the Act provides that "[i]n any proceeding under this chapter, the court may
award costs and reasonable and necessary attorney's fees as are equitable and just." Id. § 37.009
(1986). We conclude, therefore, that the trial court had both the power and discretion to award
reasonable and necessary attorney's fees to Wootan Farm Center.

 We also reject Agri-Scan's segregation argument. As a general rule, a party may
recover attorney's fees pertaining to a particular claim only if permitted by contract or by statute;
therefore, if a case involves more than one claim, a party must generally segregate the amount of
attorney's fees expended in connection with each claim. Stewart Title Guar. Co. v. Sterling, 822
S.W.2d 1, 10-11 (Tex. 1991); 4M Linen & Uniform Supply Co. v. W.P. Ballard & Co., 793
S.W.2d 320, 327 (Tex. App. 1990, writ denied). However, the supreme court recently discussed
an exception to this general duty to segregate:


 A recognized exception to this duty to segregate arises when the
attorney's fees rendered are in connection with claims arising out of the same
transaction and are so interrelated that their "prosecution or defense entails proof
or denial of essentially the same facts." . . . Therefore, when the causes of action
involved in the suit are dependent upon the same set of facts or circumstances and
thus are "interwined to the point of being inseparable," the party suing for
attorney's fees may recover the entire amount covering all claims.


Stewart Title Guar. Co., 822 S.W.2d at 10-11 (citations omitted).

 After reviewing the record, we conclude that both Jan Boultinghouse and Llano
Feed Mill, Inc. were asserting essentially the same causes of action, and each of their causes of
action entailed proving essentially the same facts. Indeed, Boultinghouse was acting as the agent
of Llano Feed Mill, Inc. during all transactions with Agri-Scan. Thus, we conclude that all of
their causes of action were interwined to the point of being inseparable; therefore, the trial court
did not err in awarding attorney's fees without requiring appellants to segregate the amount of
attorney's fees among themselves or their various causes of action.

 Therefore, we overrule Agri-Scan's sixteenth, seventeenth, and eighteenth points
of error.


FORFEITURE OF IMPROVEMENTS


 As discussed above, Wootan Farm Center and Llano Feed Mill entered into various
leases with Southern Pacific, and later Agri-Scan Corporation, for the Gray's Feed Store Property
and the Llano Feed Mill Property. All these leases contained the following forfeiture provision:


 Upon the expiration or termination of this lease, or any extension or
renewal thereof, Lessee, without further notice, shall deliver up to Lessor the
possession of the leased premises. Lessee, if not in default hereunder, shall at any
time prior to such expiration or termination, remove from the leased premises any
buildings or structures wholly owned by Lessee. Lessee shall restore said leased
premises to the condition in which they existed at the time Lessee took possession. 
Upon the failure or refusal of Lessee to remove from the leased premises all
buildings, structures and all personal property owned by Lessee, prior to the
expiration or termination of this lease, said buildings, structures and personal
property shall thereupon, at the option of Lessor, become the sole property of
Lessor . . . .


 . . . .


 Either party hereto may terminate this lease upon thirty (30) days written
notice to the other party.


 In December 1987 Agri-Scan gave notice of termination of the leases. Wootan
Farm Center and Llano Feed Mill failed to remove their $4.5 million worth of improvements from
the property within thirty days of the notice; therefore, Agri-Scan argues that it became the sole
owner of the improvements under the forfeiture provision of the leases. The trial judge rendered
judgment that Wootan Farm Center and Llano Feed Mill owned the improvements and had not
forfeited them. In their nineteenth point of error, Agri-Scan argues the trial court erred because:
(1) the jury found that Agri-Scan had not waived the forfeiture provision in the leases; and (2) the
forfeiture provision was clear and unambiguous and, therefore, must be enforced according to its
terms.

 Even if we assume that the evidence was sufficient to support a finding that Agri-Scan had not waived the forfeiture provisions, we do not conclude that the trial court erred in
failing to enforce the provisions. The law does not favor forfeitures, and courts will decline to
enforce them whenever it is against equity and good conscience to do so. Whitehead v. National
Casualty Co., 273 S.W.2d 678, 680 (Tex. Civ. App. 1954, writ ref'd); Redman v. Whitney, 541
S.W.2d 889, 893 (Tex. Civ. App. 1976, writ ref'd n.r.e.). With regard to contractual forfeiture
provisions, the supreme court has adopted the following language:


[T]he courts do not favor forfeiture and when proper equities are shown to exist
equity will intervene and will deny unjust enforcement of the naked legal right to
a forfeiture. On the other hand, when parties enter into a contract providing that
either should forfeit his rights thereunder upon default in any of the material
provisions, thereof, it then becomes the burden of the party resisting such
forfeiture to plead and prove such facts as would justify a court of equity in
preventing his adversary from doing that which otherwise, under the law, he has
a right to do, but in equity and good conscience he should not be permitted to do.


Stevenson v. Lohman, 218 S.W.2d 311, 314 (Tex. Civ. App. 1949, writ ref'd).

 As discussed above, the jury found that Agri-Scan fraudulently represented to
Wootan Farm Center and Llano Feed Mill that it would sell them the property for its unimproved
fair market value. Because of these representations, neither Wootan Farm Center nor Llano Feed
Mill attempted to buy the property from Southern Pacific. Agri-Scan then purchased the land
from Southern Pacific for $2,400 per acre, meaning that Agri-Scan paid less than $4,000 for the
land comprising the Gray's Feed Store Property and the Llano Feed Mill Property. Nonetheless,
Agri-Scan argues that it is entitled to the forfeiture of over $4.5 million worth of improvements
located on land for which it paid less than $4,000. Further, the jury also found that it would take
seventy-five weeks to remove the improvements on the Llano Feed Mill Property and three
months to remove the improvements from the Gray's Feed Store Property; therefore, to argue that
the improvements must be removed within thirty days or be forfeited is to ignore reality.

 Based on Agri-Scan's fraudulent acts and the unjust enrichment that would result
from a forfeiture, we conclude that the trial court did not err in using its equitable powers to
intervene and deny the unjust enforcement of a naked legal right to forfeiture. Thus, we overrule
Agri-Scan's nineteenth point of error.


RESCISSION


 As discussed above, in July 1987 Jan Boultinghouse entered into an earnest-money
contract with Agri-Scan Corporation for the purchase of the Llano Feed Mill Property. The
purchase price was $787,121.80. At the time she signed the contract, she paid $50,000 into
escrow to be applied against the purchase price at closing; however, Boultinghouse never closed
on the purchase. In its final judgment, the trial court ordered that the earnest-money contract be
rescinded. Agri-Scan challenges that rescission order in its twentieth and twenty-first points of
error.

 The jury found that the earnest-money contract between Boultinghouse and Agri-Scan was the product of an unconscionable action or course of action on the part of Agri-Scan;
we have concluded that there was both legally and factually sufficient evidence to support that
finding. Such actions on the part of Agri-Scan provided a sufficient basis for the trial court's
rescission of the contract. See Tex. Bus. & Com. Code Ann. § 17.50(b)(3), (4) (1987); Schenck
v. Ebby Halliday Real Estate, Inc., 803 S.W.2d 361, 366-67 (Tex. App. 1990, no writ).

 We overrule Agri-Scan's twentieth and twenty-first points of error.


JUROR MISCONDUCT


 In its twenty-second point of error, Agri-Scan argues that the trial court erred in
failing to grant its motion for a mistrial for juror misconduct. During a break in the voir dire
examination of potential jurors, one of the potential jurors delivered a note to Wootan Farm
Center's attorney in which he asked the attorney to send him his business address because he had
a disability claim against Southern Pacific Railway Company that he wished to discuss. Although
the attorney did not respond to the inquiry, he failed to bring the note to the trial court's attention
until after the jury was impaneled and the potential juror who had passed the note was picked and
seated as a juror.

 After learning of the note, the trial court conducted an examination of the juror and
also allowed each party's attorney an opportunity to examine the juror. The juror testified that
he could put the "lawyer stuff" aside and would give equal consideration to both parties. The
juror also testified that if he had had the opportunity to approach Agri-Scan's attorney first, he
would have done so. Agri-Scan first moved to excuse the juror and then moved for a mistrial. 
Both motions were denied.

 A movant for a new trial based on jury misconduct must establish: (1) that
misconduct occurred; (2) that it was material misconduct; and (3) that based on the record as a
whole, the misconduct probably resulted in harm to the movant. Flores v. Dosher, 622 S.W.2d
573, 574 (Tex. 1981); OKC Corp. v. UPG, Inc., 798 S.W.2d 300, 302-03 (Tex. App. 1990, writ
denied); Tex. R. Civ. P. 327. Whether the misconduct probably resulted in harm to the movant
is a question of law for the trial court and reviewing courts to determine from a review of the
entire record. State v. Wair, 351 S.W.2d 878, 879 (Tex. 1961).

 In the present case, Wootan Farm Center's attorney did not respond to the juror's
note. No benefit was bestowed on the inquiring juror that would create a feeling of obligation to
either party. Having conducted a review of the entire record, and taking into account the
unanimous verdict against Agri-Scan, we conclude that Agri-Scan has failed to establish that it
probably suffered harm. Therefore, we overrule Agri-Scan's twenty-second point of error.

 We affirm the judgment of the trial court.


 

 J. Woodfin Jones, Justice

[Before Justices Powers, Jones and Kidd; Justice Powers not participating]

Affirmed

Filed: August 26, 1992

[Do Not Publish]
1. According to the trial court's final judgment, the Gray's Feed Store Property consisted
of approximately 0.188 acres, and the Llano Feed Mill Property consisted of approximately
1.583 acres.
2. We note that the final judgment rendered against Agri-Scan awarded no actual damages
to Wootan Farm Center, but instead imposed a constructive trust on the Gray's Feed Store
Property and the Llano Feed Mill Property. Agri-Scan argues that Wootan Farm Center is not
entitled to punitive damages because it did not recover actual damages. We disagree. The
jury made numerous findings regarding the amount of compensation that Agri-Scan would
have to pay to Wootan Farm Center in the event the trial court did not impose a constructive
trust on the property as it did. Therefore, while the trial court gave Wootan Farm Center the
equitable remedy of constructive trust, Wootan Farm Center did obtain jury findings regarding
actual monetary damages. Such was sufficient to support the trial court's award of punitive
damages. See Consolidated Tex. Fin. v. Shearer, 739 S.W.2d 477, 479-80 (Tex. App. 1987,
writ ref'd).